Filed 4/26/18

# IN THE SUPREME COURT OF CALIFORNIA

In re I.C., a Person Coming Under the )
Juvenile Court Law. )
_____)
                                         )
ALAMEDA COUNTY SOCIAL )
SERVICES AGENCY, )
                                         )         S229276
        Plaintiff and Respondent, )
                                         )      Ct.App. 1/2 A141143
        v. )
                                         )       Alameda County
ALBERTO C., )      Super. Ct. No. SJ12019578
                                         )
        Objector and Appellant. )
_____)


In a juvenile dependency proceeding, a child's out-of-court reports of parental abuse are admissible in evidence regardless of whether the child is competent to testify in court. (*In re Cindy L.* (1997) 17 Cal.4th 15, 20 (*Cindy L.*); Welf. & Inst. Code, § 355.) But a juvenile court may not base its findings solely on the hearsay statements of a truth-incompetent child—that is, a child who may not testify because she is too young to separate truth from falsehood—unless the child's statements bear "special indicia of reliability." (*In re Lucero L.* (2000) 22 Cal.4th 1227, 1246, 1231 (plur. opn. of Mosk, J.); *id.* at pp. 1250–1251 (conc. opn. of Kennard, J.) (*Lucero L.*).) This requirement, rooted in the constitutional guarantee of due process, reflects a balance between the vital interests at the heart of the juvenile dependency system: It is designed to ensure that children are

1

protected from abuse while guarding against the risk that children will needlessly be separated from their parents on the basis of unreliable reports that are not subject to testing in court.

We granted review to determine whether, under the rule established in *Lucero L.*, certain uncorroborated hearsay statements made by a three-year-old child provided a sufficient basis to determine that she had been sexually abused by her father. Although the juvenile court found the statements to be unclear, confusing, not credible, and unreliable in significant respects, it ultimately concluded that the indicia of the statements' reliability outweighed the indicia of unreliability. Based on the child's statements, the juvenile court adjudged her a dependent of the court and ordered her father removed from the family home. The Court of Appeal, deferring to the juvenile court's weighing analysis, affirmed. Mindful of the balance of interests underlying the *Lucero L.* rule, we conclude that the juvenile court erred and reverse the judgment.

## I.

### A.

Under section 300 of the Welfare and Institutions Code (section 300), a court may exercise dependency jurisdiction over a child who has been abused, neglected, or is otherwise at risk of "serious physical harm" because of a parent's or guardian's abuse or inability to provide adequate supervision, care, or protection. (§ 300 [listing categories of children subject to dependency jurisdiction].) A dependency proceeding commences when a child welfare agency files a petition alleging that a child has been abused or otherwise comes within the court's jurisdiction under section 300. (*Id.*, §§ 325, 332.) The court then holds a hearing at which it may receive in evidence "[a]ny legally admissible evidence that is relevant to the circumstances or acts that are alleged to bring the minor within the jurisdiction of the juvenile court." (*Id.*, § 355, subd. (a); see *id.*, § 334.)

2

"Proof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300" who may be adjudged a dependent of the court. (*Id.*, § 355, subd. (a).)

"A dependency adjudication is a preliminary step that allows the juvenile court, within specified limits, to assert supervision over the endangered child's care." (*In re Ethan C.* (2012) 54 Cal.4th 610, 617.) After the juvenile court takes that preliminary step, the court may impose limitations on parental authority as necessary to protect the child. (*Ibid.*; see Welf. & Inst. Code, § 361, subd. (a).) It may also order that the child be removed from a parent's physical custody if there is clear and convincing evidence that removal is necessary to protect the child from a substantial risk of harm. (Welf. & Inst. Code, § 361, subd. (c); *In re I.J.* (2013) 56 Cal.4th 766, 773.) In some cases, a dependency adjudication may lead to termination of parental rights. (*In re Ethan C.*, *supra*, at p. 617; see *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 247–250.)

**B.**

In September 2012, the Alameda County Social Services Agency (the Agency) filed a section 300 petition to have I.C., then three years old, and her brother J.C., then five years old, declared dependents of the juvenile court. The petition alleged that I.C. had been sexually abused by her father (Father), and that both children were at risk as a result of the abuse.[1] Shortly thereafter, the court ordered that the children be temporarily placed with the Agency and issued a temporary restraining order ordering Father to move from the family home and to have no contact with I.C. and J.C. except for supervised visitation. Approximately

---

[1]  The allegations involving J.C. were dropped at the dispositional hearing.

3

two weeks later, the Agency permitted the children to return to their mother (Mother), on the condition that Father remain out of the home.

A jurisdictional hearing was held over the course of six days in December of 2012 and January and March of 2013. Evidence before the court showed that, approximately two months before the alleged parental abuse occurred, I.C. had been sexually molested by an eight-year-old neighbor named Oscar. Oscar had come to the younger children's home and was playing with them in a bedroom when Mother noticed that it had gotten quiet and the bedroom door was closed. When Mother opened the door, she saw a blanket had been thrown over the bunk bed. Oscar, I.C., and J.C. were on the bed. Mother asked, "Hey, what's going on here?" and I.C. said, "Oh, nothing. We're just kissing." Mother asked J.C. what was going on, and he began crying and responded: "Oscar was kissing [I.C.] and he put a train in her." A wooden toy train was on the bed next to the children. According to the social services report, Oscar also "stuck his penis into [I.C.'s] vagina."

Mother told Oscar, "Get out of my house . . . I'm calling your mother." Oscar ran home. Mother again asked J.C. what had happened. He said that Oscar was laying on top of I.C., kissing her, and said, "We're going to fuck." Although Oscar instructed J.C. to look away, J.C. at one point turned and saw Oscar putting the wooden train in I.C.'s vagina.

Mother called a hospital to seek advice. The hospital employee with whom she spoke, with Mother's consent, called the police. A police officer arrived and interviewed the children. The police later interviewed Oscar, who admitted to "kissing [I.C.] on the mouth" but "did not admit to inserting any toy or his penis."

Mother later testified that she did not recall either I.C. or J.C. telling her that Oscar had put his penis in I.C. The police advised Mother to take I.C. to an emergency room, where a doctor examined her. The doctor told Mother that he

4

could not tell whether Oscar had used the wooden train or if Oscar had sex with I.C.

The matter was referred to Child Protective Services, but the investigation proved inconclusive. An investigator from Child Protective Services attempted without success to contact I.C. and her parents on numerous occasions after the incident occurred. In the months that followed the incident with Oscar, Mother testified, she had many discussions about this incident with I.C., and explained the difference between "good touches and bad touches." She used the words "penis" and "vagina" during those talks.

Approximately two months after the incident, on Friday, September 7, 2012, the family saw Oscar again when Mother, Father, and I.C. took J.C. to his first day of school. I.C. said, " 'Mom, Oscar is going to [J.C.]'s school.' " Mother testified that I.C. was frightened and confused. At that point, Mother testified, "we realized we had a problem, because [I.C.] would go to the same school." The family "talked about it all weekend."

On Tuesday evening of the following week, I.C. spontaneously said to Mother: "My dad put his penis on me." J.C. corrected her, saying: "No, that's what Oscar did to you." Mother asked I.C. for details, but other than saying it happened on J.C.'s bed, "[s]he kept saying the same thing": "Daddy put his penis on me." Mother said she "tried to get [I.C.] to tell me what happened, but it didn't seem like it all went together and made very much sense."

The next morning, Mother asked I.C. about what she had said the night before. I.C. said she was "just kidding." Although I.C. did not normally go to day care on Wednesdays, Mother decided to take her, explaining that I.C. had "told me something within the last 12 hours that was rather alarming . . . and I thought until I could figure out what was the reason why she was saying this, I took her to school, where she loved to be." Mother, who worked full time, also explained that

5

she took I.C. to day care that day so I.C. would not be home with Father. Before Mother left, she woke Father and told him what I.C. had said. He said, "That's crazy."

Later that morning, a child welfare worker made an unannounced visit to I.C.'s preschool and spoke to I.C. The social services report states: "[I.C.] was open and cooperative. Minor was not able to tell the difference between telling a true [*sic*] and telling a lie. . . . [I.C.] reported to Child Welfare Worker that her father touched her vagina with his penis. [I.C.] stated that this happened in her home in [J.C.'s] room." I.C. underwent a sexual assault forensic examination at Children's Hospital in Oakland, but "results of the examination [were] inconclusive."

I.C. and J.C. were taken to the Child Abuse, Listening, Interviewing, and Coordination Center (CALICO), a facility that offers forensic interviews of children who may have suffered abuse or neglect. In a videotaped interview, I.C. again said that her father had molested her. I.C. was seated on a carpeted platform next to a padded mat. She promised to tell the truth and not tell any lies. The interviewer asked I.C. what she had done that morning and I.C. said she had watched a movie, taken a nap, gone to San Francisco with her mother, gone to the park, gone shopping with her mother and bought glasses and eggs, gone to school, played in the park, and sat in a chair at her house and watched television.

When asked what she had told her teacher at day care that morning, I.C. answered: "I told daddy put penis on me," adding, "then he put a train on me and he put a flower on me yesterday." Pointing to the mat next to her, she said, "In this bed," but then said they were on J.C.'s bed. I.C. climbed on the mat, lay down and opened her legs and, gesturing towards her groin area, said "he do this to my vagina." When asked again what Father had done, I.C. repeated: "Put a penis and then a flower and then the train." The interviewer asked what I.C. was wearing.

6

I.C. said: "I don't wear clothes . . . he take off my clothes. He take of[f] my shoes, my pants and my shirt. . . . My underwear too . . . and my socks."

I.C. said Father then kissed her on her mouth and she said, "stop it," adding: "And he didn't listen to me when I say 'stop it.' " When asked why she wanted Father to stop, I.C. said, "because he can't do that to touch me here," putting her hand on her groin area. She repeated: "He didn't listen to me, so I say 'stop it.' Then he didn't listen to me. . . . He still doesn't listen to me." The interviewer asked what I.C. wanted Father to stop doing, and she replied: "Don't do that. Okay. That's . . . mine. If he leaves my vagina alone, just leave it. Okay. Then he didn't . . . leave me alone still. . . . He still bothers me," adding: "Don't do that, okay, that's mine. If you do that then gonna be in trouble. So he do that . . . and he didn't stop it."

I.C. said she was on the bed and Father was lying next to her with no clothes on. Father "smacked the wall" five times and I.C. said, "stop it." The interviewer asked I.C., "Was any part of your Daddy's body touching any part of your body when you were lying like that?" and she answered: "Yeah. He put penis on me." When asked to say more about that, she said: "Put penis on me, and he put penis on me, he put penis on me yesterday," gesturing toward her groin area each time and adding "five times" and holding up five fingers. When asked what Father had done five times, I.C. said, "this and this and this and this and this," moving her hand to her vagina each time. I.C. said it did not feel good. I.C. demonstrated that Father "put penis on me like this," touching her vagina, and "then like that," poking between her legs with her fingers two times, adding "he put penis on me and he do this, this, this, this," poking with her hand each time. Asked if anything came out of Father's penis, I.C. said, "Yeah," adding, "it's ducky."

7

Asked if a penis is the same thing as a train, she said, "Yeah." I.C. said she got up and ran away to a car in her garage "[b]ecause he did stuff to me and I'm sad."

I.C. said when Mother returned home, she told Mother what Father had done and "told her 'stop it.' " She "said, Daddy, stop it, that's not . . . yours, that's mine. Anyone can touch my vagina." I.C. "told her 'stop it' and her listen to me." I.C. stated Mother said, " '[S]top.' 'Oh my, daddy is going to be in all so much trouble.' " I.C. said her father was going to jail and had told the police, " 'I promise, I won't do it again.' "

When asked whether Father had ever done that before, I.C. said "yes," explaining: "He put, hmm, another train on me." When asked if this ever happened anywhere else besides in J.C.'s bed, I.C. said, "it was in my house and here." Asked to explain what she meant by "here," she gestured to the mat next to her.

The interviewer asked, "have you ever seen your daddy do that to anybody else?" and I.C. answered, "He do that to RJ," Father's 21-year-old daughter from a previous marriage. Asked what she saw Father do, I.C. said: "Put penis in the flower and the train and train and . . . that's it." She added that Father removed RJ's clothes and removed his own clothes and RJ kissed him. I.C. was with them on J.C.'s bed, as well as her babysitter and her babysitter's sister. Asked what Father wanted to do, she said, "the bad things," which are "[t]he train, the train and train—and the flower and the penis."

After a break, the interviewer asked I.C. if Father touched her vagina with his penis "on the outside or the inside" and I.C. said: "The inside." When asked how that felt, she said: "Feels hurt." When asked where it hurt, she pointed to her groin area and said, "here." She said that Father took off her clothes and kissed

8

her vagina. That felt "not good." She repeated "not good" several times. She said it happened in J.C.'s bed four times, a "long time" ago.

At the jurisdictional hearing, the child welfare worker assigned to the case, Sylvina Cooper, testified that she believed "that the allegation of sexual molest of the minor, [I.C.], is accurate" and "that there has to be a process for the father in terms of counseling . . . and for someone to assess when and if it would be a good time for the father to return to the family unit."

Cooper testified that I.C. "presents as being very, very intelligent and very, very mature, beyond the age of three. And she has a very high level of language development." Cooper watched the video recording of I.C.'s CALICO interview and "believe[d] that most of the statements that [I.C.] made are credible" and that I.C. knows the difference between what is true and what is false. I.C. reported to her mother, school personnel at the day care center, the child welfare worker who interviewed I.C. at the day care center, and the CALICO interviewer that her father had sexually molested her and each account was consistent. Cooper knew of no possible motive for I.C. to make up these allegations. Finally, Cooper testified that during a supervised visit, I.C. asked if Father could come home.

Father's 21-year-old daughter from a previous marriage, who is known as RJ, testified that Father had never touched her inappropriately and she had never seen her father touch I.C. inappropriately.

Throughout the juvenile dependency proceedings, Father denied that he molested his daughter and Mother stated that she does not believe he did.

## C.

After the close of evidence, the juvenile court declared I.C. a dependent child of the court, finding by a preponderance of the evidence that Father sexually molested I.C. In a lengthy ruling, the court stated:

9

"This is a very difficult case because the evidence comes from a three-year-old child who, at times, was very clear in her statements about what happened, and at other times was very unclear, and at times very confusing about the statements that she makes concerning what she alleges her father did to her.

"Essentially, all the Court has to go on in this case is the hearsay statements of a three-year-old minor, [I.C.].  [¶] . . . [¶]

". . . The Court believes that when the minor made the statement to her mother that, 'Daddy put penis on me,' this was a statement that came out of the blue.  It was completely spontaneous.  It was not a product of [] prompting on the part of the mother.  The mother was caught completely off guard by the statement. . . . [¶] . . . [¶]  [T]hey were not in the middle of the discussion of what occurred in July or any other matters of a sexual nature.  [¶] . . . [W]hen the minor made the same statements shortly thereafter to the staff at the day care center, again, the statements were completely spontaneous.

"She has consistently repeated the same core allegations to various people: Her mother, the day care center staff, and the Calico staff.  [¶]  In fact, on the Calico tape, she depicted the incident with great detail, using gestures, hand signs, words, and actions, as were noted in the police report.  She repeats the details throughout the 40 minutes or so of the interview.  [¶] . . . [¶]  And the court can find no evidence that she has a motive to lie about the statements that she made.

"What supports unreliability:  Her very confusing statements about the train and the flower as it relates to the father.  It's very difficult to follow her thought process in relating the train and the flower to her father.  It leads one to believe that maybe she's having some sort of flashback to the July encounter with the eight-year-old.  [¶] . . . .

"Another piece of evidence that one could conclude leads to the unreliability of her statements is that she made statements during the course of her

10

Calico interview that both her stepsister, RJ, was in the bed with her and her father, and two other girls, that they were all naked, and the father was wanting to do bad things to them, to each one of them. These statements are not believable, and in fact, were denied by RJ. [¶] Her statement on the Calico tape that she had an encounter with the father on the couch at Calico was not correct, and it's unreliable. [¶] . . . [¶]

"So there's supporting evidence on both sides. . . . [¶] But the Court finds the evidence that supports the reliability more compelling. The Court does not subscribe to the theory that the minor is having a flashback to the July incident and is projecting that incident onto the father. [¶] There's several distinctions between the July incident and the statement made by the minor regarding the September encounter with the father. For example, . . . in the July incident, the minor never used the word penis to describe her experience with the eight-year-old. . . . [T]he minor did not say that the eight-year-old had used his penis. She only referred to a train being used. And according to the observations of her brother, a toy train was used in that incident. [¶] In the September incident, although she talked about a train and she talked about a flower, she was very clear in her statement that, 'Daddy put his penis on me.' [¶] She did not refer to anyone other than the father . . . . [¶] In the July incident, both the mother and the brother were at home. In the Calico statements, she was very clear that the encounter with her father occurred while her mother was at work and while her brother was at school. It's a very different scenario than the scenario in the July incident. [¶] . . . [¶]

"So to this Court, reviewing all the evidence that's been presented, the core allegations of the minor have remained consistent, they have remained spontaneous throughout the recounting of this incident, and the Court can find no motive on her part to lie about this. The Court can find no credible evidence that there is or was a psychological process that was involved here that caused the

11

minor to somehow misstate what had happened to her in July with what she claims her father did to her. The Court can find no evidence of any fraud or any deceit or any und[ue] influence." The court confirmed that it based its ruling on the hearsay statements of I.C. "and the circumstances under which those statements were made."

The juvenile court held a dispositional hearing in several sessions over the course of the following year. Based in significant part on its jurisdictional finding that Father had sexually molested I.C., the juvenile court found that the Agency had sustained its burden of proof and ordered that Father continue to be removed from the family home until further order of the court.

## D.

The Court of Appeal affirmed the juvenile court's jurisdictional and dispositional findings. Noting that the case involved a "somewhat novel application of *In re Lucero L.*," the court concluded that the "juvenile court's decision to receive evidence of [I.C.'s hearsay statements] . . . is supported by substantial evidence and thus properly served as the basis for asserting the jurisdiction of the juvenile court over the minor as a dependent child." The court acknowledged, as had the juvenile court, that discrepancies in I.C.'s statements made this " 'a very difficult case.' " But the court noted that the juvenile court had both viewed the videotaped CALICO interview with I.C. and "took particular pains to state its reasoning as to why it found I.C.'s evidence reliable." "Given the scrupulousness with which the juvenile court evaluated the pros and cons of the hearsay statements," the court concluded, "there is no basis on this record for overturning the juvenile court's jurisdictional finding." The court further concluded that the jurisdictional finding supported its dispositional finding "that the minor's safety required separation from [Father]."

12

Justice Stewart dissented. In her view, the juvenile court erred in asking merely whether I.C. was "more credible than not," rather than asking whether I.C.'s truthfulness was " ' "so clear" ' that ' "the test of cross-examination would be of marginal utility." ' (*Lucero L.*, *supra*, 22 Cal.4th at p. 1249 [(plur. opn. of Mosk, J.)].)" She further faulted the Court of Appeal majority for failing to review the record for substantial evidence that would have met that standard. In her view, "[t]he juvenile court's own concerns about the reliability of I.C.'s hearsay statements—all of which were uncorroborated [fn. omitted]— demonstrates that there is not substantial evidence that meets the *Lucero L.* mandate."[2]

## II.

## A.

As a general rule, an out-of-court statement offered for the truth of its content is inadmissible in evidence. (Evid. Code, § 1200.) This rule, which is "of venerable common law pedigree," is rooted in concerns about reliability. (*Cindy L.*, *supra*, 17 Cal.4th at p. 27.) Unlike in-court testimony, hearsay statements generally are not made under oath; they are generally made outside of the view of the trier of fact, which therefore cannot adequately assess the speaker's credibility; and they are not generally subject to testing through cross-examination. (*Cindy L.*, *supra*, 17 Cal.4th at p. 27; *Englebretson v. Industrial etc. Com.* (1915) 170 Cal.

---

[2]    Father's counsel has informed this court that Father has since been permitted to return home, subject to Mother's supervision of his interactions with I.C., and that the juvenile court dismissed the dependency proceeding shortly before our grant of review. Father argues, however, that the case is not moot because the jurisdictional finding has significant continuing consequences. The Agency did not file a response and conceded at oral argument that the jurisdictional finding has significant continuing consequences for Father. We agree with the parties that the case is not moot.

793, 798.)  In cases of suspected child abuse or neglect, however, strict adherence to the rule would lead to the exclusion of firsthand reports of many victims in the very proceedings that are designed to protect them from harm.  Child victims of abuse and neglect may be unable to testify in court for a number of reasons; young children, in particular, are often incompetent to testify in court because they are unable to understand the duty to tell the truth under oath.  (See Evid. Code, § 701, subd. (a)(2) ["A person is disqualified to be a witness if he or she is:  [¶] . . . [¶] [i]ncapable of understanding the duty of a witness to tell the truth."].)  For that reason, the traditional hearsay bar has been modified in the juvenile dependency context to allow courts to consider certain out-of-court statements concerning suspected abuse or neglect, including the statements of so-called "truth-incompetent" young children.

This court first began to frame what we have termed the "special evidentiary rules for dependency hearings" in *In re Malinda S.* (1990) 51 Cal.3d 368 (*Malinda S.*).  (*Lucero L.*, *supra*, 22 Cal.4th at p. 1237 (plur. opn. of Mosk, J.).)  In *Malinda S.*, we held that statutory provisions authorizing juvenile courts to consider "social studies" prepared by probation officers or social workers also implicitly created a hearsay exception for the various hearsay statements typically contained in such studies.  (*Malinda S.*, *supra*, 51 Cal.3d at p. 379.)  We further held that courts may rely on such studies as "competent evidence" in making their jurisdictional findings.  (*Id.* at p. 382 [construing Welf. & Inst. Code former § 355].)  In so ruling, we had "assumed that those whose hearsay statements appear in a social study would be available for cross-examination. [Citation.]  We did not consider whether such statements would be admissible and competent evidence if the testimony of the child making those statements was not available during the hearing."  (*Cindy L.*, *supra*, 17 Cal.4th at p. 22.)

14

In part to codify the rule of *Malinda S.*, the Legislature in 1996 amended Welfare and Institutions Code section 355 (section 355), which prescribes rules for the conduct of jurisdictional hearings. (*Lucero L.*, *supra*, 22 Cal.4th at pp. 1240–1242 (plur. opn. of Mosk, J.).) Subdivision (a) of section 355, as amended, provides: "[a]ny legally admissible evidence that is relevant to the circumstances or acts that are alleged to bring the minor within the jurisdiction of the juvenile court is admissible and may be received in evidence." Subdivision (b) adds: "A social study prepared by the petitioning agency, and hearsay evidence contained in it, is admissible and constitutes competent evidence upon which a finding of jurisdiction pursuant to Section 300 may be based, to the extent allowed by subdivisions (c) and (d)."[3] Finally, subdivision (c)(1) of section 355 provides: "If a party to the jurisdictional hearing raises a timely objection to the admission of specific hearsay evidence contained in a social study, the specific hearsay evidence shall not be sufficient by itself to support a jurisdictional finding or any ultimate fact upon which a jurisdictional finding is based, unless the petitioner establishes one or more of the following exceptions," including, as particularly relevant here: "(B) The hearsay declarant is a minor under 12 years of age who is the subject of the jurisdictional hearing. However, the hearsay statement of a minor under 12 years of age shall not be admissible if the objecting party establishes that the statement is unreliable because it was the product of fraud,

---

[3]   "For purposes of this section, 'social study' means any written report furnished to the juvenile court and to all parties or their counsel by the county probation or welfare department in any matter involving the custody, status, or welfare of a minor in a dependency proceeding pursuant to Article 6 (commencing with Section 300) to Article 12 (commencing with Section 385), inclusive." (§ 355, subd. (b)(1).)

15

deceit, or undue influence."[4] As amended, section 355 "broadly authorize[s] reliance on any hearsay contained in the social study by a child victim under the age of 12, as long as an objecting party does not prove that the statement was procured by means of fraud, deceit, or undue influence." (*Cindy L.*, *supra*, 17 Cal.4th at p. 28, fn. 6.)

In a separate development, California courts in the wake of *Malinda S.* also crafted a broader, more general common law "child dependency exception" for out-of-court statements of children in dependency proceedings. (*Cindy L.*, *supra*, 17 Cal.4th at p. 20; see *In re Carmen O.* (1994) 28 Cal.App.4th 908.) In *Cindy L.*, we explained that although courts must "proceed with caution" in developing new exceptions to the "general rule that hearsay evidence is inadmissible because it is inherently unreliable," the child dependency exception concerned a class of evidence for which there was a "substantial need." (*Cindy L.*, at pp. 27–28.) We explained: "[T]here are particular difficulties with proving child sexual abuse: the frequent lack of physical evidence, the limited verbal and cognitive abilities of child victims, the fact that children are often unable or unwilling to act as witnesses because of the intimidation of the courtroom setting and the reluctance to testify against their parents. [Citation.] Given these realities, the categorical exclusion of child hearsay . . . will often mean the exclusion of significant, reliable evidence required for the juvenile court to assert its jurisdiction over the child and to ultimately protect him or her from an abusive family relationship." (*Id.* at p. 28, fn. omitted.)

---

**4**     Subdivision (d) of section 355 states: "This section shall not be construed to limit the right of a party to the jurisdictional hearing to subpoena a witness whose statement is contained in the social study or to introduce admissible evidence relevant to the weight of the hearsay evidence or the credibility of the hearsay declarant."

16

We also acknowledged in *Cindy L.* that necessity alone is insufficient; "an exception to the hearsay rule is not valid unless the class of hearsay evidence proposed for admission is inherently reliable." (*Cindy L.*, *supra*, 17 Cal.4th at p. 28.) To "better safeguard the reliability of a child's hearsay statements" (*ibid.*) and to "provide specific due process protections for parents in child dependency hearings" (*id.* at p. 18), we concluded that a child's out-of-court statements were admissible if: (1) "the time, content and circumstances of the statement provide sufficient indicia of reliability"; (2) the child is available for cross-examination or other evidence corroborates the child's statements; and (3) interested parties have notice the statements will be used (*id.* at p. 29).

In *Cindy L.*, we noted the passage of the Legislature's 1996 amendments to section 355, but had no occasion to consider their import, since the amendments postdated the events at issue in the case. (*Cindy L.*, *supra*, 17 Cal.4th at p. 28, fn. 6.) We considered those amendments for the first time in *Lucero L.*, in which we explored the relationship between the social study exception codified in the newly amended section 355 and the child dependency exception recognized in *Cindy L.*

The question in *Lucero L.* concerned a juvenile court's admission of, and reliance on, the hearsay statements contained in a social study of a truth-incompetent three-year-old child. In a plurality opinion authored by Justice Mosk, the court concluded that section 355 authorizes the admission of such statements contained in a social study, regardless of whether the statements satisfied the test for admission under the child dependency exception announced in *Cindy L.*, including the requirements of reliability and corroboration. (*Lucero L.*, *supra*, 22 Cal.4th at p. 1231 (plur. opn. of Mosk, J.).) But the plurality opinion explained that " '[t]he admissibility and substantiality of hearsay evidence are different issues.' " (*Id.* at p. 1244.) Even though the hearsay statements of a truth-

17

incompetent child, contained in a social study, are admissible, the plurality concluded, they "may not be relied on solely as a basis for a jurisdictional finding unless the court finds that they show special indicia of reliability." (*Id.* at p. 1231.)

In so holding, the plurality applied the balancing test "under California and federal law used to determine what sort of process is due in a given judicial or administrative proceeding." (*Lucero L.*, *supra*, 22 Cal.4th at p. 1246 (plur. opn. of Mosk, J.).) The plurality reasoned that "relying too heavily on the hearsay statements of incompetent minors to make jurisdictional findings when there has been no opportunity for cross-examining the minor" (*id.* at p. 1244)—and, in particular, when the minor "has been determined to be incompetent to distinguish between truth and falsehood" (*id.* at p. 1246)—raises a substantial risk of erroneously depriving parents of their substantial interest in maintaining custody of their children. (*Id.* at pp. 1244–1247.) Accordingly, due process requires a showing that " 'the time, content and circumstances of the statement provide sufficient indicia of reliability' " before a juvenile court may rely exclusively on such a statement in making its jurisdictional findings. (*Id.* at p. 1248.) On the other hand, the plurality concluded, the federal and state Constitutions do not require that the child's statements be corroborated by other evidence; while " '[a] requirement of corroboration is an additional safeguard against the possibility of fabrication by very young witnesses whose out-of-court statements are insulated from the rigors of cross-examination,' " it is not "mandated by due process." (*Id.* at pp. 1248–1249.) Applying these principles, the plurality in *Lucero L.* upheld a jurisdictional finding based on the hearsay statements of the truth-incompetent child, concluding that the statements were sufficient to sustain the finding because they showed special indicia of reliability. (*Id.* at pp. 1231, 1249–1250.)

18

In a concurring opinion, Justice Kennard, joined by Justice Brown, generally agreed with the plurality's legal framework: "(1) Hearsay statements by a minor who is the subject of a Welfare and Institutions Code section 300 hearing, and who is incompetent to testify because of an inability to understand the obligation to tell the truth, are admissible under [section 355] when they appear in a social study and are not the product of fraud, deceit, or undue influence; (2) this rule of admissibility does not violate the federal and state Constitutions; and (3) such statements may not form the *sole* basis for a jurisdictional finding unless they show special indicia of reliability." (*Lucero L.*, *supra*, 22 Cal.4th at pp. 1250–1251 (conc. opn. of Kennard, J.).) Justice Kennard disagreed with the plurality's application of the rule to the facts of the case, however; in her view, because there was corroborating evidence in the case, it was unnecessary to decide, as the plurality had, whether the child's hearsay statements bore special indicia of reliability.

Justice Chin, joined by Justice Baxter, concurred in the result. He also agreed with the plurality that "the hearsay statements in the social study were *admissible* and that unreliable and uncorroborated hearsay, alone, would be *insufficient* to sustain the trial court's jurisdictional finding." (*Lucero L.*, *supra*, 22 Cal.4th at p. 1252 (conc. opn. of Chin, J.).) He would have based that conclusion solely on section 355's requirement that a jurisdictional finding must be supported by "proof by a preponderance of the evidence," though he acknowledged that "[i]t might also violate due process to base a finding on unreliable and uncorroborated evidence." (*Id.* at p. 1253.)

**B.**

**1.**

In this case, Father does not challenge the juvenile court's decision to admit his three-year-old daughter's out-of-court statements describing the alleged

19

incident of abuse. He contends, rather, that the juvenile court misapplied the rule of *Lucero L.* when it relied solely on those statements in finding that the abuse occurred. I.C.'s uncorroborated out-of-court statements, he argues, did not manifest the special indicia of reliability required by *Lucero L.* to sustain the court's jurisdictional finding.[5]

In pressing this argument, Father relies heavily on a passage in *Lucero L.* in which the plurality responded to concerns about the due process implications of dispensing with *Cindy L.*'s requirement that a child's hearsay statements be corroborated to be admitted in evidence: "In concluding that the corroboration requirement is inapplicable, we emphasize the importance of juvenile court scrutiny of the statements of young children who are both legally incompetent and insulated from cross-examination. At least in the case of a truth incompetent minor, the court may rely exclusively on these out-of-court statements only 'if the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility . . . .' " (*Lucero L.*, *supra*, 22 Cal.4th at p. 1249 (plur. opn. of Mosk, J.), quoting *Idaho v. Wright* (1990) 497

---

[5]    At oral argument, counsel for the Agency argued for the first time—and contrary to the position taken in its briefing—that *Lucero L.* does not apply at all because there was no evidence that I.C. was truth incompetent. The Agency has forfeited this argument by failing to raise it in a timely manner. (See *People v. Clark* (2016) 63 Cal.4th 522, 584.)

Both parties have assumed that due process does not require that a child's hearsay statements be corroborated by independent evidence. The plurality opinion in *Lucero L.* so stated (see *Lucero L.*, *supra*, 22 Cal.4th at pp. 1248–1249 (plur. opn. of Mosk, J.)), but because the other members of the court believed that there was, in fact, corroborating evidence in that case, there was no majority vote for the proposition. We agree with the plurality opinion that corroboration is not a due process requirement. (See *id.* at p. 1249 [noting that a criminal prosecution may be based on a child's uncorroborated hearsay statement and reasoning that "[t]he standard of evidence cannot be higher under the due process clause in a dependency hearing"]; *id.* at p. 1248.)

U.S. 805, 820.) Father contends that the juvenile court ignored this requirement of "clear truthfulness" when it determined that I.C.'s statements were sufficiently reliable to support its jurisdictional finding, and that no substantial evidence in the record satisfies the "clear truthfulness" standard.

While we agree with Father that the juvenile court erred in its evaluation of the reliability of I.C.'s statements, we do not believe the court's error lies in its failure to ask whether I.C.'s truthfulness was "so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility." The test established in *Lucero L.*, endorsed by a majority of the members of the court, is simply whether the statements show "special indicia of reliability." (*Lucero L.*, *supra*, 22 Cal.4th at p. 1231 (plur. opn. of Mosk, J.); *id.* at pp. 1250–1251 (conc. opn. of Kennard, J.).) The "clear truthfulness" language quoted in the plurality opinion was borrowed from *Idaho v. Wright*, *supra*, 497 U.S. 805, in which the high court held that the prosecution in a criminal trial may introduce the out-of-court statements of a young victim of child abuse if the statements bear " 'adequate "indicia of reliability." ' "[6] (*Id.* at p. 815.) The court explained that

---

[6] Since *Idaho v. Wright*, the high court has held that substantive reliability is no longer the touchstone of admissibility of hearsay statements in a criminal case; the operative question, instead, is whether the hearsay declarant is bearing "testimony" against the accused. (*Crawford v. Washington* (2004) 541 U.S. 36, 54.) If the declarant's statements are testimonial, the confrontation clause of the Sixth Amendment ordinarily prohibits their introduction unless the witness is "unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Ibid.*) Applying this framework, the high court has held that a young child's out-of-court statements describing abuse to a teacher are not testimonial, and has noted that "[s]tatements by very young children will rarely, if ever, implicate the Confrontation Clause." (*Ohio v. Clark* (2015) 576 U.S. ___, ___–___ [135 S.Ct. 2173, 2181–2182].) The high court has not squarely addressed whether *Idaho v. Wright* has continued vitality in the wake of *Crawford*, nor has it addressed whether due process places any limitations on reliance in criminal cases on the uncorroborated hearsay statements of a child witness that do

*(Footnote continued on next page.)*

this determination is to be made by reference to "relevant circumstances . . . that surround the making of the statement and that render the declarant particularly worthy of belief," without regard to any evidence that might corroborate the statement. (*Id.* at p. 819.) The court went on to explain that this rule "derives from the rationale for permitting exceptions to the general rule against hearsay," which the court summarized as follows: "[I]f the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility, then the hearsay rule does not bar admission of the statement at trial." (*Id.* at pp. 819–820.)

When the court in *Idaho v. Wright* applied these general principles to the case before it, however, the court did not suggest that the proper inquiry was whether it would have been more than marginally useful to cross-examine the two-and-a-half-year-old child declarant in the case. It instead outlined a nonexhaustive list of factors for a court to consider when deciding whether "the child declarant was particularly likely to be telling the truth when the statement was made"—that is, whether the child's statements bore indicia of reliability comparable to statements falling under recognized exceptions to the hearsay rule. (*Idaho v. Wright*, *supra*, 497 U.S. at p. 822; *id.* at p. 827.) And likewise in *Lucero L.*, this court engaged in the same sort of analysis to uphold the juvenile court's jurisdictional finding in what it acknowledged was a "close" case involving a

---

*(Footnote continued from previous page.)*

not satisfy the *Idaho v. Wright* standard of reliability. (Cf. *Jackson v. Virginia* (1979) 443 U.S. 307, 318 [due process requires that a criminal conviction be supported by evidence sufficient to support a finding of guilt beyond a reasonable doubt].) We have no occasion to consider these questions in this civil dependency case.

series of hearsay statements by a three-and-a-half-year-old child that "were not identical in every detail." (*Lucero L.*, *supra*, 22 Cal.4th at p. 1250 (plur. opn. of Mosk, J.).) The law's general approach to the development of exceptions to the hearsay bar does properly inform the inquiry. (See *Idaho v. Wright*, at p. 820.) But ultimately the question is simply whether the " 'time, content and circumstances of the statement provide sufficient indicia of reliability' " to support the juvenile court's jurisdictional finding, considering the important interests at stake. (*Lucero L.*, *supra*, 22 Cal.4th at p. 1248 (plur. opn. of Mosk, J.), quoting *Cindy L.*, *supra*, 17 Cal.4th at p. 29.)

This reliability requirement is not designed to be "especially formidable," or to be "so stringent" that "it will impede the government's ability to protect children in an abusive situation." (*Lucero L.*, *supra*, 22 Cal.4th at p. 1247 (plur. opn. of Mosk, J.).) But neither is it an empty formality. Rather, as *Lucero L.* made clear, the reliability requirement is an important procedural safeguard against the risk of erroneous determinations based solely on hearsay statements "in an area in which the truth of a hearsay statement [is] particularly open to question," and in which the cost of error may be to needlessly separate families from one another, at substantial cost to parents and children alike. (*Id.* at p. 1248 (plur. opn. of Mosk, J.); *id.* at p. 1247; *id.* at pp. 1250–1251 (conc. opn. of Kennard, J.); see *Malinda S.*, *supra*, 51 Cal.3d at pp. 383–384.)

We have previously identified certain factors courts may consider in determining whether a child's hearsay statements satisfy this standard of reliability, including: "(1) spontaneity and consistent repetition; (2) the mental state of the declarant; (3) use of terminology unexpected of a child of a similar age; and (4) lack of motive to fabricate." (*Cindy L.*, *supra*, 17 Cal.4th at p. 30, citing *Idaho v. Wright*, *supra*, 497 U.S. at pp. 821–822; *id.* at p. 29.) *Cindy L.* also cited "the child's ability to understand the duty to tell the truth and to distinguish

23

between truth and falsity" as a factor—albeit not a determinative one—in determining the reliability of her out-of-court statements. (*Cindy L.*, at p. 30.) A court's determination is not limited to these factors, however; "any factor bearing on reliability may be considered." (*Lucero L.*, *supra*, 22 Cal.4th at p. 1250 (plur. opn. of Mosk, J.).) "[T]he unifying principle is that these factors relate to whether the child declarant was particularly likely to be telling the truth when the statement was made." (*Idaho v. Wright*, *supra*, 497 U.S. at p. 822.)

**2.**

The juvenile court in this case acknowledged the nature of the task before it, observing: "This is a very difficult case because the evidence comes from a three-year-old child who, at times, was very clear in her statements about what happened, and at other times was very unclear, and at times very confusing about the statements that she makes concerning what she alleges her father did to her." Although the court made no express finding that I.C.'s statements bore special indicia of reliability, the court concluded that I.C.'s statements were sufficiently reliable because the statements were made spontaneously, because I.C. was consistent in her "core allegations" (that her father had put his penis on her), and there was no evidence that I.C. had been prompted or coached, or that she had any motive to lie. The juvenile court acknowledged, on the other hand, that several of I.C.'s statements regarding Father's alleged abuse were "not believable," and that I.C.'s "very confusing statements about the train and the flower . . . lead[] one to believe that maybe she's having some sort of flashback" to her earlier sexual molestation by her eight-year-old neighbor, Oscar. The court rejected the latter possibility, explaining that "the minor never used the word penis to describe her experience with the eight-year-old," that I.C.'s description of the September incident differed in certain respects from the circumstances of the July incident, and that I.C. had stated during the CALICO interview that "what her father did to

24

her hurt." In affirming the juvenile court's judgment, the Court of Appeal understood the juvenile court to apply the correct standard under *Lucero L.*, and it considered itself bound by the substantial evidence standard to defer to the court's weighing analysis, given the "scrupulousness with which the juvenile court evaluated the pros and cons of the hearsay statements."

We agree with the Court of Appeal that the juvenile court's lengthy ruling is commendably thorough. It is, however, a separate question whether the ruling is adequately supported by the record.

The plurality opinion in *Lucero L.* states, and the parties here have assumed, that the juvenile court's ruling must be upheld if supported by substantial evidence. (See *Lucero L.*, *supra*, 22 Cal.4th at p. 1249 (plur. opn. of Mosk, J.), citing *Soto v. State of California* (1997) 56 Cal.App.4th 196, 199.) We accordingly proceed on that assumption as well.[7] Substantial evidence is a deferential standard, but it is not toothless. It is well settled that the standard is not satisfied simply by pointing to " 'isolated evidence torn from the context of the whole record.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 577, quoting Traynor, The Riddle of Harmless Error (1969) p. 27; *id.* at p. 578.) Rather, the evidence supporting the jurisdictional finding must be considered "in the light of the *whole record*" "to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value . . . ." (*Johnson*, at pp. 577–578.) And in the *Lucero L.* context in particular, in which the central determination at issue concerns the very reliability of the evidence on which the court has based its

---

[7]     We note, however, that there was not a majority for this proposition in *Lucero L.*; because the other members of the court concluded that the child's statements in the case were corroborated, they did not consider the standard of review that applies to a court's decision to rely solely on the uncorroborated hearsay statements of a truth-incompetent minor.

findings, a court may not conclude that the standard is satisfied merely because the record contains some evidence that the court *could have* found reliable; a reviewing court instead must consider whether the record as a whole provides substantial evidence to support a determination that the child's statements bear special indicia of reliability.

Here, the evidence supporting I.C.'s reliability was weaker than the juvenile court acknowledged. Although the juvenile court addressed the factors identified in *Lucero L.*, it failed to take adequate account of the confounding role of I.C.'s prior molestation. For example, the juvenile court emphasized that I.C.'s initial statement to her mother that her father had sexually abused her "came out of the blue." But I.C. had been sexually molested only two months earlier by an older child. The incident resulted in a response from police, a hospital examination, and many discussions with Mother about inappropriate touching and about private body parts. On the Friday before I.C. made her statement regarding Father, I.C. saw Oscar for the first time since he molested her when the family took her brother to his first day of school. I.C. was frightened "and very confused" and the family "talked about it all weekend." It was early the following week when I.C. first said that her father had "put his penis on me." Given the timing, it is unsurprising that her family's immediate reaction—including that of her five-year-old brother—was that I.C. was somehow recalling her earlier molestation: "No, that's what Oscar did to you." Under these circumstances, the fact that I.C. spoke spontaneously of sexual molestation was not a compelling indicator of trustworthiness. The probability that I.C.'s statements resulted from her recent molestation by Oscar, and her surprise encounter with her abuser just days earlier, cannot be ignored.

The juvenile court also relied heavily on its finding that I.C. "has consistently repeated the same core allegations to various people." But the

26

consistency of I.C.'s "core allegations" was not particularly strong given the juvenile court's own finding that many of I.C.'s core allegations were either false or confusing. In her CALICO interview, for example, I.C. asserted that she had a naked encounter with her father, her stepsister RJ, the babysitter, and the babysitter's sister. As the juvenile court noted, these statements were "not believable." As for the "core allegation" that Father put his penis on her, I.C. also stated that Father put a train and a flower on her, that a penis is the same thing as a train, and that she had seen her father "[p]ut penis in the flower and the train and train." As the juvenile court acknowledged, these statements were "very confusing" and again suggested that I.C. might be recalling the July incident in which Oscar used a toy train.

The connection between the alleged abuse by Father and the July incident in which I.C. was molested and her recent surprise encounter with her abuser also was stronger than the juvenile court acknowledged. As noted, both the timing and content of I.C.'s allegations concerning her father strongly suggested a relationship to her earlier molestation. It is true, as the juvenile court noted, that no evidence showed that I.C. herself had previously used the word "penis" in connection with her molestation by Oscar. But a social services report concerning the incident indicates that Oscar had "stuck his penis in [I.C.'s] vagina." Mother testified that over the following weeks, she and I.C. engaged in several conversations about the incident, using words such as "penis" and "vagina."

It is also true, as the juvenile court noted, that I.C.'s description of the circumstances surrounding the abuse by her father differed in certain respects from the circumstances surrounding the abuse by Oscar. For example, while the incident involving Oscar occurred while Mother was at home, I.C. told the CALICO interviewer that the abuse by Father had occurred while her mother was at work and J.C. was at school. But I.C.'s description changed over the course of

the interview; at another point, she told the interviewer that her mother was sleeping at the time of the abuse. And in any event, the differences between these accounts would go only to show that I.C. was not referring to the incident with Oscar, or misremembering the incident involving Oscar as having involved Father. These differences also are consistent, however, with the possibility that I.C. had woven her memories of the incident with Oscar into an imagined account of strikingly similar abuse by her father.

Although, as the juvenile court noted, there is no evidence in this case to suggest that I.C. was coached or had a motive to lie, the evidence does indicate that I.C. had a tendency to interweave fantasy with truth. Her fantastical statements ranged from the highly significant—for example, her assertion that her father had molested her along with her stepsister, babysitter, and babysitter's sister—to the mundane: After promising to tell the truth, I.C. told her interviewer that she had spent the morning taking a nap with her babysitter, watching a movie, going to San Francisco, and going to the park, when, in fact, she had done none of those things. This pattern is equally relevant in evaluating whether I.C. was likely telling the truth about the incidents involving Father.

The Agency argues that our review must take account of the testimony of Child Welfare Worker Sylvina Cooper, who, the parties stipulated, "is an expert in risk assessment for child abuse and child sexual abuse." Cooper testified that she believed that Father had molested I.C., and that I.C. was not merely recalling the earlier incident involving Oscar. But Cooper herself had not discussed the allegations with I.C.; her opinion was based on her review of I.C.'s statements to Mother, day care teachers, the child welfare worker, and the CALICO interviewer. When asked to explain the basis for her belief, Cooper cited I.C.'s "very detailed descriptions of what she said that her father did to her. Her use of words that he put his penis on her. That she told him that this was bad, these are bad things . . . .

28

She put gestures.  It just seemed very, very specific regarding her father."  Cooper also acknowledged, however, that discussions in the home regarding I.C.'s previous sexual abuse "could" have had some impact on I.C.'s allegations involving her father.  She further acknowledged that some of I.C.'s allegations were, in fact, false.  Cooper's opinion that I.C. was telling the truth about the alleged abuse by Father does not constitute substantial evidence that I.C.'s statements bear special indicia of reliability.

**3.**

The Court of Appeal, in upholding the juvenile court's determination, acknowledged the "weaknesses and inconsistencies of I.C.'s statements."  But it deferred to the juvenile court because it believed that the juvenile court's determination rested on an evaluation of I.C.'s credibility based on what the court had seen in the videotaped interview.  The court reasoned that "[s]uch a credibility determination qualifies as a legitimate consideration, one of the non-enumerated factors 'bearing on reliability' permitted by *Lucero*," and that such credibility determinations are "beyond [the] power" of an appellate court "to revisit."  We conclude this was error.

There are certainly many advantages to videotaping interviews with suspected victims of child abuse.  Among them, videotaping makes it easier to evaluate the circumstances under which the child's statements were given and the propriety of the interviewing techniques, and it creates a clear record of what the child said and the manner in which she said it.  (Cf. *Commonwealth v. Patton* (2010) 458 Mass. 119, 134 ["A videotape possesses 'certain special characteristics,' including the precise words used by the child and display of the child's demeanor as she related what happened, adding to its reliability"]; Off. of Atty. Gen., Cal. Dept. of Justice, California Child Victim Witness Judicial Advisory Committee:  Final Report (Oct. 1988) p. 27 [Recording an interview

with a child, "more so than a written record, can assist in determining whether a child was asked leading questions, or was prodded into giving certain answers."]; *id.* at p. 28.)

But the fact that the juvenile court was able to view a videotape of I.C.'s interview (as, indeed, was this court) does not end the inquiry. We are required to consider the entire record to determine whether the juvenile court's finding is supported by substantial evidence. It is possible that the juvenile court may have been influenced by I.C.'s gestures as captured on the video recording; as noted, Child Welfare Worker Cooper mentioned these gestures in explaining the basis for her opinion that I.C. had been molested. But as noted, given I.C.'s prior sexual molestation, we cannot conclude that the degree of sexual knowledge demonstrated by her gestures is an accurate indicator of the reliability of her allegations involving Father. It is not clear what else, if anything, the juvenile court may have seen in the videotape that might have influenced its reliability determination. The Agency has not argued that I.C.'s demeanor during the interview supports the reliability of her allegations involving Father, and the juvenile court made no such finding. And as all acknowledge, I.C. was not telling the truth at several points during the interview. In the end, assumptions about the conclusions the juvenile court might have drawn about the child's credibility from viewing an out-of-court videotaped interview are not a substitute for careful consideration of whether the record as a whole provides substantial evidence to support a finding that the child's statements bear the requisite special indicia of reliability. The videotape, in short, cannot close the substantial gap between the indications of I.C.'s unreliability and the juvenile court's finding that I.C.'s account was sufficiently reliable to support a jurisdictional finding.

**4.**

A juvenile court presented with a child's out-of-court reports of parental abuse faces a sensitive and difficult task. "Although the parent has an interest in avoiding an erroneous finding of jurisdiction, the child—and, accordingly, the court—has at least as important an interest in avoiding erroneous findings of *no* jurisdiction." (*Lucero L.*, *supra*, 22 Cal.4th at p. 1257 (conc. opn. of Chin, J.).) Courts evaluating abuse allegations must keep in mind that a child's verbal and cognitive limitations may prevent her from providing an account of her abuse that is as coherent and consistent as we might expect from an adult. (See *id.* at p. 1250 (plur. opn. of Mosk, J.).) A child's account may reflect uncertainty, and may even contain some contradictions, and nevertheless warrant the court's trust. (See *United States v. Dorian* (8th Cir. 1986) 803 F.2d 1439, 1444–1445.)

This case, however, involves an unusual situation in which the child recently had been molested and had just encountered, once again, the older child who had molested her. Her repeated statements about abuse were strikingly similar to descriptions of that recent act of molestation. Moreover, the child's accounts contained both inconsistences and inaccuracies that were woven through her core allegations. The juvenile court acknowledged that its jurisdictional finding was based entirely on the child's hearsay statements, but the court did not make an express finding, and the record supplies no adequate basis to support an implied finding, that the child's statements bore special indicia of reliability as required by *Lucero L.* The juvenile court therefore erred in making its jurisdictional finding that the child had been sexually abused by her father, on which the court based its order that the father be removed from the family home.

31

## III.

The judgment of the Court of Appeal is reversed.

**KRUGER, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**RENNER, J.**\*

---

\*      Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re I.C.

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 239 Cal.App.4th 304
**Rehearing Granted**

_____

**Opinion No.** S229276
**Date Filed:** April 26, 2018

_____

**Court:** Superior
**County:** Alameda
**Judge:** Willie Lott, Jr.

_____

**Counsel:**

Louise E. Collari, under appointment by the Supreme Court, for Objector and Appellant.

Aida Aslanian for California Appellate Defense Counsel as Amicus Curiae on behalf of Objector and Appellant.

Donna R. Ziegler, County Counsel, Melinda Leong Capozzi, Nicole L. Roman and Samantha Stonework-Hand, Deputy County Counsel, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Louise E. Collari
4115 Blackhawk Plaza Circle, Suite 100
Danville, CA  94506
(925) 487-3795

Samantha Stonework-Hand
Deputy County Counsel
1221 Oak Street, Suite 450
Oakland, CA  94612
(510) 272-6700