Filed 3/30/22  In re K.O. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re K.O. et al., Persons Coming Under the Juvenile Court Law. | B312286 (Los Angeles County Super. Ct. No. 20CCJP06802A-B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> S.A., <br><br> Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Sherri Sobel, Judge Pro Tempore, and Linda L. Sun, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Jane E. Kwon, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

In this juvenile dependency appeal, S.A. (mother) challenges the juvenile court's jurisdictional findings, removal order, and limitation of her educational rights as to her 14-year-old twin children. Relying on our Supreme Court's decision in *In re I.C.* (2018) 4 Cal.5th 869 (*I.C.*), mother claims her children are truth-incompetent. She argues, therefore, the juvenile court erred in making its jurisdictional findings because the court relied "almost solely" on her children's statements of physical abuse without considering whether those statements demonstrated special indicia of reliability. Because we disagree with mother's characterization of her children as truth-incompetent, her *I.C.* argument fails. Moreover, her children's statements are supported by other evidence in the record. Thus, we affirm the court's jurisdictional findings.

Mother also claims the juvenile court committed reversible error when it removed her children from her physical custody without considering whether reasonable efforts had been made to avoid removal. We agree the juvenile court erred by not considering reasonable efforts, however, we conclude it was not reversible error. Therefore, we also affirm the removal order.

Finally, mother argues the juvenile court erred when, at the detention hearing, it sua sponte removed her educational rights as to her children. As discussed below, under the

circumstances at the time the court made its order, we find no abuse of discretion and affirm.

## BACKGROUND

### 1. The Family

Mother and her ex-wife Elizabeth O. are the parents of twin children, a boy (son) and a girl (daughter) (collectively children), who were 14 years old when these proceedings began. Mother and Elizabeth legally separated in 2016. As part of their separation, mother and Elizabeth stipulated mother would have primary care and custody of the children and Elizabeth would have visitation rights. Elizabeth now lives in Illinois and, until recently, had not stayed in contact with the children. Mother and the children previously had lived in Santa Barbara County, however, when the underlying proceedings began, mother and children were staying in the Los Angeles area visiting relatives. Mother did not have a permanent address and planned to relocate to Los Angeles County.

### 2. Events Preceding Petition

In December 2020, the Los Angeles County Department of Children and Family Services (Department) received a referral regarding the children. The referral was generated after police responded to a domestic dispute at the home of mother's sister (aunt) and her husband (uncle). At the time, mother and the children were staying at a hotel in the area for the holidays. Mother had allowed the children and their dog to go out with aunt earlier in the day. After the children had been away longer than mother expected, mother called the police and reported aunt had kidnapped the children. Mother told the police aunt "is bossy and controlling and did not return her children."

The police also spoke with the children and aunt. Daughter told the police that, earlier in the day, while mother was sleeping in one bedroom of their three-bedroom hotel room, daughter noticed the family dog had urinated and defecated in the living room area. Although daughter tried to clean up the dog's mess without waking mother, daughter turned on a light which woke up mother. Mother yelled at daughter, called her names, grabbed her by the head, and threw her against a wall. Daughter asked mother to stop. Eventually, daughter went to her bedroom until aunt arrived a few hours later. Daughter did not have any bruising or swelling from the incident.

The police also spoke with son. He told the police mother "had been in and out of sleep for the past three days." He said mother made him and daughter sleep when she sleeps, regardless of the time. In the past, mother had been verbally upset with the children if they turned on lights or wrote in journals when she slept. On that particular day, son said he was not in the same room with daughter when mother threw her against a wall but he heard mother yelling at daughter for turning on a light. Son heard mother call daughter disparaging names and daughter cry out " 'No, No, No,' " after which son heard "what sounded like a body being slammed up against a wall." Later, daughter told son mother had "grabbed her by the head and threw her against a wall." Son also reported that, two weeks earlier, mother was mad and punched him in his left thigh. The officer saw "small bruising" on son's left thigh. Son explained he often pretended to be asleep so mother would not yell at or hit him.

The police also spoke with aunt. Although aunt did not see mother physically harm either child, she heard mother yelling at them from outside the hotel room earlier that day when aunt

4

went to visit them. Mother told aunt she was upset with the children but did not specify why. Aunt offered to take the children and the dog out, to which mother agreed. While the children were with aunt, son explained mother was upset with them because daughter had turned on a light. Aunt asked if mother had ever physically hurt them. Son stated mother had hit him in the past and hit daughter that morning.

Based on the police investigation, an officer referred the family to the Department. The next day, a Department social worker spoke with the children, who had stayed at aunt's home. Daughter told the social worker that, the day before, the family dog "had barfed on the rug at the hotel and she needed to turn on the light to see and that is when the mother grabbed her by the head and pulled her hair." Daughter said "mother pushed her body against the wall and told her she was stupid." Daughter had no marks or bruises following the incident. In addition, daughter told the social worker this was not the first time mother had been physical with her and son. Daughter said mother had hit them many times in the past including punching daughter's right shoulder "a while back" and, a couple of weeks earlier, threw a dish at daughter. Daughter stated she did not feel safe with mother especially since mother knew daughter and son were "talking to authorities." Daughter wanted mother to get psychological help.

The social worker also spoke with son, who described the events of the previous day. Son said he had been in a separate room at the hotel when he heard daughter saying, " 'No, No, No.' " Although son did not see mother's interaction with daughter, he heard daughter "hit a wall." Like daughter, son reported mother had been physically and verbally abusive with

them for years.  When asked by the social worker about visible marks on his left knee, son said mother had punched him three to four weeks earlier.  Son also reported previous bruising on his right arm after mother had pushed him against a concrete wall.  Son did not want to return to mother's care.  He said he would return to her care after she received "mental help."

Aunt also spoke with the social worker.  Aunt explained she and uncle support mother financially and, until recently, she had not seen mother or the children for seven years.  A few days earlier, however, mother had called aunt in hysterics, saying "she could not take it any longer."  Aunt and uncle then paid for mother and the children to stay at the hotel nearby.  Aunt had never seen mother hit the children but explained the day before she had heard mother verbally abuse the children.  Aunt said mother "has been demonstrating rage and she does drink alcohol."  Aunt also noted mother's former wife had been abusive.

The social worker spoke with mother at the hotel.  Mother said she was a survivor of domestic violence and had almost been killed in a hotel while daughter watched.  Mother said her former wife had been abusive.  Mother denied hitting the children and did not know why they had bruises.  She said she had "grabbed her daughter by the jacket to clean the litter box" and thought son's leg might have bruised after "crossing his legs with his laptop."  Mother denied substance abuse or alcohol use.

A few days later, another Department social worker spoke with the children individually.  Son reiterated that mother had been verbally and physically aggressive with him and daughter for years.  He noted the bruises he had on his leg after mother punched him a few weeks earlier and said other times mother threw dishes at him and daughter.  Son "was adamant in not

wanting to return to the mother's care until the mother receives the help that she needs." Son remembered earlier investigations by social workers, stating "[b]ack then we lied for our mom" partly because she told them to and partly because he was scared of her.

Daughter expressed relief at being away from mother, stating she felt she had a " 'voice' " and could speak up. Daughter restated that mother had been verbally abusive toward her and son. Like son, daughter was "adamant that she did not want to return to the mother's care until the mother is 'better.' " The social worker noted the children "presented as mature and well spoken."

Aunt also spoke with the social worker. She said she and her parents (the maternal grandparents) had experienced mother's rage but she had been unaware the children also had experienced it. Aunt did not know if mother's behavior was due to drugs or to mental health issues.

### 3. Petition and Detention

On December 29, 2020, the Department filed a Welfare and Institutions Code section 300 petition on behalf of the children (petition).[1] The petition alleged six counts, three of which addressed mother's alleged physical abuse of son and three of which addressed mother's alleged physical abuse of daughter. The counts were brought under subdivisions (a), (b), and (j) of section 300.

At the detention hearing held a couple of days later, the juvenile court ordered the children detained from mother. The

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

children remained placed with aunt and uncle.[2]  The court ordered the Department to provide family reunification services to mother and the children, ordered mother "to participate in anger management and parenting," and ordered monitored visitation.

At the hearing, counsel for the children noted mother had the children's school computers and was unsure whether she would return them to the children.  Counsel requested that the Department "ensure that [the children] have adequate and appropriate technology for distant learning which resumes [in one week]."  Following counsel's request, the juvenile court ordered the Department to "go to the mother's home and retrieve the chrome books for the children" and if there were difficulties in doing so, the Department was to alert the court.  The juvenile court also ordered sua sponte, "The aunt and uncle retain their rights to make educational, regional center and medical decisions for the children.  I am removing that right from the mother at this time even if it is just for the next 90 days until we come back."  Counsel for mother objected to the court's order removing her educational rights.

4.     **Further Investigation**

Prior to adjudication, the Department continued its investigation.

a.     *Previous Referrals*

The Department reported six previous child welfare referrals related to the family between the years 2015 and 2020.

---

[2] Prior to the detention hearing, and in light of the children's fear of returning to mother and allegations of physical abuse, the Department had detained the children "with exigency."

The referrals concerned mother's alleged substance abuse (alcohol, methamphetamine), mental health issues (bipolar disorder, anxiety, panic attacks, depression), neglect of the children, and sometimes aggressive behavior.  Each referral was deemed unfounded.

    **b.**    ***Son***

The day after the December 2020 incident at the hotel, son underwent a forensic medical exam for "suspected child physical abuse and neglect."  The resulting medical report noted "Faint bruises on the left anterior thigh and left knee.  Child disclosed that mom punched him about two weeks ago. [¶] No other marks or bruises noted today. [¶] Child disclosed that mom punches him, kicks him, hits him with power cable.  Disclosed fear of mom."  Son told the examiner, " 'Sometimes I don't like living with my mom, I'm scared of her all the time.  She is irrationally angry for dumb reasons that a normal person wouldn't be angry about. . . .  She hits us with her fists, elbows, kicks.  She whipped us with a power cord.  One or two days ago she punched [daughter] and slammed her against the wall.  She punched me on my left leg and knee two weeks ago, I still have the bruise.' "

In late February 2021, a Department social worker interviewed son.  Son told the social worker mother's physical abuse began when he and daughter were seven or eight years old.  Son indicated mother hit him many times on different parts of his body over several years.  He could not remember details of particular instances of the physical abuse because it happened so often.  For example, although son said mother punched him and caused the recent bruising on his leg, he could not remember when that punch occurred.  Similarly, son indicated mother threw plates and other items " 'on a regular basis.' "  Many times,

9

when mother threw a plate, it hit son before shattering on the floor. Son also discussed an incident described in the petition when mother pushed him into a concrete wall, injuring his arm. Son clarified that incident did not cause bruising to his arm (as alleged in the petition), rather it caused cuts and scrapes on his arm. He said he was scared of mother.

Son described the December 2020 hotel incident between mother and daughter. Son explained he had not witnessed the incident because he was in a different room. He said he heard the impact of daughter hitting a door in their hotel room. He said, on previous occasions, he had witnessed mother punch daughter.

### c. *Daughter*

After the December 2020 hotel incident, daughter did not have any bruising or marks and, therefore, unlike son, she did not undergo a forensic medical examination.

In late February 2021, a Department social worker spoke with daughter. Daughter told the social worker the allegations in the petition were accurate. She described one time when mother punched her shoulder, giving her a " 'huge bruise.' " She said mother " 'grabbed me and slammed me against the wall. She hit me on my shoulder. She got me by the top of my head and pushed me to the hallway. She was like trying to pull my shirt up and was this close to my face screaming at me.' " Daughter also told the social worker mother threw plates and other objects at her and son.

Daughter said she had seen mother punch, hit, and push son. Daughter said, " 'Some things, I was probably in another room and maybe heard it, but didn't see it. I don't remember, but I'm going to believe my brother. And always after, if I heard or

10

[son] heard, we would check in on each other. But we didn't discuss what happened.' " She noted " 'the last seven years have been a blur. It's hard to remember everything.' " She stated she and son had never before told social workers about mother's abuse.

Daughter was angry with mother for saying daughter and son were lying about mother's abusive conduct. Daughter believed mother did not "pay a lot of attention to her kids." Daughter noted, "I've struggled awhile since 2019. I'm scared of dying but I think about it a lot. She doesn't know I cried every day, because she wasn't feeding us, she didn't know I was starving myself and crying every day. I still do cry pretty much every day. I do have bad thoughts about hurting myself, about what I eat." Daughter said she has a good relationship with her therapist and talks with her therapist about these thoughts. In February 2021, daughter's therapist submitted a letter for the court, stating she had been treating daughter for one month. The therapist reported she and daughter currently were focusing on "the effects of trauma including symptoms of depression and anxiety, body dysmorphia and disordered eating behaviors."

### d.    *Mother*

The social worker also interviewed mother. Mother adamantly denied the allegations in the petition. She said the children's stories did not make sense, son was lying, and daughter was "corroborating the story" to protect son. Mother denied hitting or striking the children or pushing them into walls. She noted she had seen bruises on son's legs months earlier and wondered how he got them. She thought he may have gotten them from "sitting Indian style with his laptop because he has restless leg syndrome" or perhaps during his sleep by hitting

11

his legs on his bed frame.  Although mother also denied throwing objects at the children, she stated she had thrown things when she was "very mad."  She said, "I have thrown [son's] Xbox out the back door, I've thrown their phone and my phone off a 2nd story, I threw [son's] iPod out the car window one time. . . . I have thrown a plate, but I have never, ever, ever aimed anything at my children."

Mother did not believe the children were scared of her.  She said son was mad at her because she left Elizabeth.  Mother told the social worker Elizabeth "was abusive during their relationship, and the police were called many times."  Mother said daughter (but not son) had witnessed that abuse.  Mother reported she no longer disciplined the children.  Instead, she said "we had conversations.  They could be tough conversations."  She could remember spanking daughter one time, when she was three or four years old.

Mother described the children as "so secure in their safety with me.  I would never let anything happen to them.  I would never let any physical harm or danger come anywhere near them and they would both say that I'm a mama bear and nobody is going to get in our space."  Nonetheless, mother admitted she needed help, "We're all hurting much more than I thought from the divorce and lack of support.  I did the best I could."

e.    *Elizabeth*

Elizabeth told the social worker she had never seen mother physically abuse the children.  However, Elizabeth stated mother physically abused her when they were together.  As to allegations in the petition, Elizabeth said, "It was hard to hear and I'm not surprised because I was a recipient of that (abuse) and I didn't report it."

12

Elizabeth reported that, after their separation, mother made it very difficult for Elizabeth to see the children. Elizabeth said mother "antagoniz[ed] her and [made] false accusations of domestic violence against her." Elizabeth lost contact with the children and eventually moved to Illinois. Recently, however, Elizabeth had telephone contact with the children and was happy to be back in their lives. She told the social worker, "if the children were not being cared for by relatives, and needed her, she would do what she needed to provide for them. However, she recognizes that she has not had a relationship with the children in sometime and does not want to uproot them from California, which is where they're from."

### f.    *Aunt*

The social worker also spoke with aunt, with whom the children had been placed. Aunt said, "Stories are coming out every day of different abuse going on. They were so scared."

Aunt was present when son had his forensic medical examination. She told the examiner she believed mother had mental health issues. Aunt also said mother "has a history of drug and alcohol use." According to aunt, after mother and Elizabeth divorced, mother could not afford a home. Her father, the children's grandfather (grandfather), paid for the various hotels where mother and the children stayed. However, at some point mother stole from grandfather and he stopped supporting her financially. As a result, aunt began financially supporting mother. Aunt also discussed the incident at the hotel, stating "When I went to the motel my sister was screaming at the kids and cursing at them because she couldn't sleep. She always had trouble sleeping or sleeping too much. She wants all the lights turned off when she sleeps. When we went to my car, [the

13

children] started crying and told me mom punched both of them, pulled [daughter's] hair. One time she hit both of them with an electric cord."

### g. *Multidisciplinary Assessment*

A few times during February 2021, as part of the family's multidisciplinary assessment, another social worker interviewed the children. Both children said mother physically abused them for many years. They both "worrie[d] about [their] mother's wellbeing, because [they] cannot understand why [their] mother is so angry and reacts so violently for no apparent reason." The social worker reported the children were "oriented in time, person and place and [their] memory is intact," they understood the consequences of not following rules, and their "current developmental functioning is on target for [their] age group."

As to daughter, the social worker noted she "shared memories about her mother's negative and aggressive temper." Daughter expressed a daily fear that mother would kidnap her and son "to continue the abuse." Daughter also suffered from an eating disorder related to mother frequently telling daughter she was fat. At the time of the interview, daughter did not believe mother had changed, stating " '[s]he will not get better if she is not forced to receive help.' " Daughter said, " 'I want my mother to receive Mental Health, get better, stop her aggressive behavior and abuse. I'm not sure if I can ever forgive her for what she did to me.' " As to son, the social worker reported son did not want contact with mother "until she gets treatment and modifies her parental style." He did not want to visit with mother and only did so because it was court-ordered.

14

**h.** *Visits*

Between February and mid-March 2021, 12 visits were scheduled for mother and children. Mother cancelled four of those visits and was over one hour late for one. Another visit was cancelled because mother was running almost one hour late. The children cancelled the last visit, and son did not attend two of the visits. Although each visit was scheduled for two or three hours, the six visits that took place lasted approximately 30 to 45 minutes. The children were upset with mother during and after their visits in part because mother did not appear to take any responsibility for the family's current circumstances, was not addressing her mental health, continued to be demanding of the children, and made them feel sad. Son expressed frustration with mother, stating " 'Every time we're on these visits, she denies everything. We don't know if she's improving. We can't even get an apology from her.' "

In a March 2021 last minute information for the court, the Department stated, "Visitation between the mother and minors has posed several concerns and is evidently affecting the minors negatively, so much so that the minor [son] has stopped attending the visits altogether and the minors both constantly worry about returning to their mother's care and whether she is making any progress. The minors have stated that their worries and fears are due to the mother's past abuse and her behavior and confrontation during visitation, which suggests that she has not taken accountability and will not make any changes."

**i.** *Department Assessment*

In its jurisdiction and disposition report, the Department summarized its findings in part as follows: "Although [mother] denies that she has ever physically abused her children, and most

15

of the minors' reports of physical abuse occurred years ago, it is absolutely clear that the minors do not want to return to their mother's care. The minors, specifically [son], reported many accounts, details, and examples of what he describes as his mother's physical abuse, emotional abuse, and neglect. Both minors have stated on many occasions, and to various parties (i.e. continuing services CSW, dependency investigator, caregiver) that they are afraid of their mother, and do not want to return to her care."

## 5.    Jurisdiction and Disposition

A combined adjudication and disposition hearing was held on March 12, 2021, before a different hearing officer. At the hearing, the children's attorney asked the juvenile court to sustain the petition. Counsel stated, "Throughout the entirety of all of the reports in evidence, the children have expressed being extremely fearful of [mother] due to that mother's unpredictable and volatile behaviors and the ongoing physical abuse that they have suffered." Counsel also argued mother's "continued denial of any physical harm and other abuse is extremely problematic here and demonstrates a current risk." Similarly, counsel for the Department urged the court to sustain the petition. Counsel argued the children were "extremely credible" and had been "incredibly consistent." Counsel for the Department noted the children both had indicated they could not remember details of their abuse "because it occurred so many times," which resulted in "some confusion and vagueness, because this is, sadly, a constant occurrence in these children's lives."

On the other hand, counsel for mother asked the court to dismiss the petition. Counsel claimed the children's statements were not reliable, stating "we do not believe any of the allegations

16

that the children have raised are true." Mother's attorney claimed the evidence before the court amounted only to "some very smart children and a lot of other circumstantial issues that could lead to concerns and, perhaps, even a fear. But without physical abuse having taken place, that fear is something to be resolved outside of this court or, perhaps, pled in a different petition under different allegations. [¶] But, as of today, this court has no evidence outside the children's statements that any physical abuse took place, no other witnesses, and this Department interview where the children give incredibly vague and inconsistent answers. The only consistency is that they're vague." Mother's counsel argued the Department investigators asked leading questions when interviewing the children, who failed to give any specific or detailed answers. He believed the children were lying in order to "live . . . with their rich aunt in Manhattan Beach in a wealthy school district, and everything would be like it was before their mothers were divorced and their family became bankrupt."

As to disposition, counsel for mother urged the juvenile court to return the children to mother. Counsel argued the Department had failed to make reasonable efforts to prevent detention, noting the Department's "adjudication report is silent as to whether or not [the court-ordered] referrals were made." Counsel specified there had been no showing the Department had discussed reasonable services with mother, "no interview between the mother and the social worker, no dates in which the social worker provided referrals to the mother for classes despite the court ordering the Department to do so at our detention hearing." No one addressed educational rights at the hearing.

The juvenile court sustained the petition as plead and declared the children dependents of the court. The court found the children's versions of events corroborated by one another and aunt, as well as by the December 25 police report and daughter's mental trauma. The court noted both son and daughter "have stated multiple times that they are afraid to be returned to the mother, and they do not feel safe to be returned." The court adopted the arguments of counsel for the children and the Department and found "the abuse occurred so frequently that the children's memory may have already faded and they appear to feel numb about the multiple occurrences of physical abuse by the mother."

The juvenile court removed the children from mother's custody and care and ordered family reunification services. Although counsel for the Department conceded there was no evidence regarding the court-ordered referrals other than visitation, the court stated, "I don't think at this juncture there will be any argument as to reasonable efforts. The finding is as to whether there's still a current risk to the children if the children are not removed from the mother, and I make those findings. So I don't think the reasonable efforts on the part of the Department to refer services before they were ordered is proper at this juncture." The court's minute orders from the hearing state the Department both "made reasonable efforts to prevent removal but there are no services available to prevent further detention" and "has complied with the case plan by making reasonable efforts to return the child home." The juvenile court also ordered for mother, among other things, monitored visitation in a therapeutic setting and individual counseling with anger

management.  The court did not address mother's educational rights.

**6.     Appeal**

On April 20, 2021, mother appealed the juvenile court's March 12, 2021 findings and orders.

<b>DISCUSSION</b>

**1.     Jurisdiction**

**a.     *Applicable Law***

In this case, the juvenile court exercised its jurisdiction under section 300, subdivisions (a), (b)(1), and (j).

Under subdivision (a), a juvenile court may assert dependency jurisdiction and declare a child a dependent of the court when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian. For purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian that indicate the child is at risk of serious physical harm."  (§ 300, subd. (a).)

Under subdivision (b)(1), a juvenile court may assert dependency jurisdiction and declare a child a dependent of the court when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of the child's parent or guardian to adequately supervise or protect the child, . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness,

19

developmental disability, or substance abuse." (§ 300, subd. (b)(1).)

And under subdivision (j), a juvenile court may assert dependency jurisdiction and declare a child a dependent of the court when "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions. The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child." (§ 300, subd. (j).)

"The legislatively declared purpose of these provisions 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm*.' (§ 300.2, italics added [in *I.J.*].) 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.) " 'The purpose of dependency proceedings is to prevent risk, not ignore it.' " (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1104.) Nonetheless, "[a]lthough evidence of past conduct may be probative of current conditions, the court must determine 'whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm.' [Citations.] Evidence of past conduct, without more, is insufficient to support a jurisdictional finding under section 300. There must be some reason beyond

20

mere speculation to believe the alleged conduct will recur." (*In re James R.* (2009) 176 Cal.App.4th 129, 135–136.)

### b.   *Standard of Review*

" 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] ' "[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate]." '[Citation.]" [Citations.]' " (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) Under this standard, our review " 'begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact. All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the verdict, if possible. Where there is more than one inference which can reasonably be deduced from the facts, the appellate court is without power to substitute its deductions for those of the trier of fact.' " (*In re David H.* (2008) 165 Cal.App.4th 1626, 1633.) "We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary

21

conflicts. [Citation.] The judgment will be upheld if it is supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) "[I]nconsistencies and conflicts in the evidence go to credibility of witnesses and weight of the evidence, which are matters for the trial court." (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1149.)

> ### c. *Substantial evidence supports dependency jurisdiction under section 300, subdivisions (a), (b)(1), and (j).*

Relying on *I.C.*, *supra*, 4 Cal.5th 869, mother argues the children were truth-incompetent and, therefore, the juvenile court could not, but erroneously did, rely "almost solely" on their hearsay statements to exercise its dependency jurisdiction over them. We disagree both with mother's assessment of the children as truth-incompetent and characterization of the juvenile court's findings as unsupported by substantial evidence.

In *I.C.*, our Supreme Court reiterated two long-settled principles of dependency law. First, "[i]n a juvenile dependency proceeding, a child's out-of-court reports of parental abuse are admissible in evidence regardless of whether the child is competent to testify in court." (*I.C.*, *supra*, 4 Cal.5th at p. 875; see also *id.* at pp. 884–886.) Second, in cases involving a "truth-incompetent child—that is, a child who may not testify because she is too young to separate truth from falsehood—" the juvenile court cannot base its findings "solely on the hearsay statements of [that] child . . . unless the child's statements bear 'special indicia of reliability.' " (*I.C.* at p. 875; see also *id.* at pp. 886–887.)

22

In that case, a three-year-old child made hearsay statements that her father had sexually abused her. (*I.C.*, *supra*, 4 Cal.5th at p. 875.) The child's statements constituted the only evidence of sexual abuse by the father. It was undisputed the child was truth-incompetent.[3] The juvenile court found her statements "to be unclear, confusing, not credible, and unreliable in significant respects." (*I.C.*, at p. 875.) Nonetheless, the juvenile court concluded her statements were more reliable than not reliable and declared her a dependent of the court. (*Id.* at p. 876.) The reviewing Court of Appeal deferred "to the juvenile court's weighing analysis" and affirmed. (*Ibid.*)

Our Supreme Court reversed. (*I.C.*, *supra*, 4 Cal.5th at p. 896.) In order to rely solely on the child's hearsay statements of sexual abuse, the juvenile court was required to determine whether her statements "bore special indicia of reliability." Our Supreme Court determined the juvenile court failed to make such a finding, and the record did not support an implied finding that the child's hearsay statements bore special indicia of reliability. (*Ibid.*) Thus, the judgment was not sufficiently supported by the evidence.

This case is easily distinguished from *I.C.* for the simple reason the children here are not truth-incompetent. Contrary to mother's contention, there is no indication the children were "too

---

[3] The respondent in the case, Alameda County Social Services Agency, took the position for the first time at oral argument before the Supreme Court (and contrary to the position it took in its briefing) that there was no evidence the three-year-old child was truth-incompetent. Our Supreme Court held the respondent had failed to raise its argument in a timely manner and, therefore, had forfeited it. (*I.C.*, *supra*, 4 Cal. 5th at p. 888, fn. 5.)

23

young to separate truth from falsehood." (*I.C.*, *supra*, 4 Cal.5th at p. 875.) In fact, the record supports the opposite conclusion. The children uniformly were described as smart, mature, and articulate. They were assessed as "oriented in time, person and place and [their] memory is intact," they understood the consequences of not following rules, and their "current developmental functioning is on target for [their] age group." They were 14 years old at the time the underlying proceedings began, a far cry from the three-year-old child in *I.C.* Accordingly, *I.C.* is inapplicable here.

In effect, mother asks us to disbelieve the children's statements because they lacked detail and find the children lied about mother's physical abuse in order to live "with their rich aunt." This type of credibility determination, however, is not for us to make. As noted above, matters of credibility are squarely within the province of the juvenile court. (*In re I.J.*, *supra*, 56 Cal.4th at p. 773; *In re S.A.*, *supra*, 182 Cal.App.4th at p. 1149; *In re Dakota H.*, *supra*, 132 Cal.App.4th at p. 228.) Here, the juvenile court made its credibility determination, finding the children were credible despite perceived weaknesses in their statements. As the Department points out, and as noted by our Supreme Court in *I.C.*, "[a] child's account may reflect uncertainty, and may even contain some contradictions, and nevertheless warrant the court's trust." (*I.C.*, *supra*, 4 Cal.5th at p. 896.) Indeed, the juvenile court here stated "the abuse occurred so frequently that the children's memory may have already faded and they appear to feel numb about the multiple occurrences of physical abuse by the mother." We find no reason to reject the juvenile court's credibility determination.

24

The children's statements of physical abuse by mother over the course of many years constitute substantial evidence supporting dependency jurisdiction under subdivisions (a), (b)(1), and (j) of section 300. In addition, the children's statements not only support one another but they also are supported by other evidence in the record. For example, when aunt arrived at the hotel where mother and the children were staying in December 2020, she heard mother yelling and cursing at the children. Son had visible bruises on his leg. Elizabeth and aunt both stated they previously had borne the brunt of mother's violent temper, and earlier child welfare referrals noted mother's aggressive behavior. Thus, although mother urges us to believe her over her children, substantial evidence supports the juvenile court's jurisdictional findings.

## 2. Removal

### a. *Applicable Law and Standard of Review*

When a child has been adjudged a dependent child within the meaning of section 300, the juvenile court "may limit the control to be exercised over the dependent child by any parent" if necessary to protect the child. (§ 361, subd. (a)(1).) Section 361, subdivision (c)(1) permits the juvenile court to order a child removed from his or her parent if the court finds by clear and convincing evidence that the child is, or would be, at substantial risk of harm if returned home and there are no reasonable means by which the child can be protected without removal. " ' "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." ' " (*In re A.S.* (2011) 202 Cal.App.4th 237, 247, disapproved on another ground by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7 (*O.B.*).)

In making its determination, the juvenile court may consider the parent's past conduct as well as present circumstances. (*In re A.S.*, at p. 247.)

We review the juvenile court's removal order under the substantial evidence standard of review. (*In re Nathan E.* (2021) 61 Cal.App.5th 114, 123.) "In reviewing for substantial evidence to support a dispositional order removing a child, we 'keep[] in mind that the [juvenile] court was required to make its order based on the higher standard of clear and convincing evidence.' " (*Ibid.*; *O.B.*, *supra*, 9 Cal.5th at pp. 1011–1012.)

In addition, "[t]he juvenile court is statutorily required to determine 'whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home' and 'shall state the facts on which the decision to remove the minor is based.' " (*In re L.O.* (2021) 67 Cal.App.5th 227, 246–247; § 361, subd. (e).) "However, 'cases involving a court's obligation to make findings regarding a minor's change of custody or commitment have held the failure to do so will be deemed harmless where "it is not reasonably probable such finding, if made, would have been in favor of continued parental custody." ' " (*In re L.O.*, at p. 247.) "[T]his is because a removal order 'is subject to the constitutional mandate that no judgment shall be set aside "unless, after an examination of the entire cause, including the evidence, the [appellate] court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." ' 'Under this mandate, a "miscarriage of justice" will be declared only when the appellate court, after examining the entire case, is of the opinion that " 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " '

[Citation.] 'Reasonable' probability means merely a reasonable chance that is more than an abstract possibility; it does not mean more likely than not." (*Ibid.*)

**b. *Substantial evidence supports the juvenile court's removal order and its failure to address reasonable efforts was harmless error.***

Mother claims "[n]o substantial, clear and convincing evidence supported the removal order." We disagree.

The facts supporting jurisdiction, discussed above, also support the juvenile court's removal order. Not only had the juvenile court found repeated instances of physical abuse, the children consistently expressed their fear of returning to mother's care. Moreover, their short visits with mother had not been positive. In addition, mother adamantly denied she ever abused the children. " '[D]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision.' " (*In re A.F.* (2016) 3 Cal.App.5th 283, 293; *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 601 [parent's denial of violence increases risk].) Considering the entire record, we conclude substantial evidence supports the juvenile court's removal order.

Finally, as mother correctly states and the Department concedes, the juvenile court failed to comply with its statutory mandates under section 361, subdivision (e), to determine "whether reasonable efforts were made to prevent or to eliminate the need for removal [of the minor from his or her home]" and to "state the facts on which the decision to remove [the minor] is based." Contrary to mother's position, however, we conclude the court's error was harmless. (*In re L.O.*, *supra*, 67 Cal.App.5th at p. 247.) Based on our review of the record, we conclude it is not

reasonably probable that the juvenile court would have found the children could safely be returned home.

## 3. Educational Rights

Finally, mother argues the juvenile court abused its discretion when, at the detention hearing, it limited her educational rights as to the children. Because it did not request the order or take a position on the matter below, the Department did not brief this issue on appeal, stating it "is not the proper respondent regarding this issue." We find no abuse of discretion.

### a. *Applicable Law and Standard of Review*

"Parents have a constitutionally protected liberty interest in directing their children's education. [Citations.] However, when a child is a dependent child, a court may limit a parent's ability to make educational decisions on the child's behalf by appointing a responsible adult to make educational decisions." (*In re R.W.* (2009) 172 Cal.App.4th 1268, 1276; § 361, subd. (a)(1).) "A court-imposed limitation on a parent's educational rights 'may not exceed those necessary to protect the child.'" (*R.W.*, at p. 1276; § 361, subd. (a)(1).) An order limiting a parent's educational rights is reviewed for abuse of discretion, "bearing in mind '[t]he focus of dependency proceedings is on the child, not the parent.'" (*R.W.*, at p. 1277.)

### b. *No Abuse of Discretion*

Here, the juvenile court limited mother's educational rights as to her children sua sponte at the detention hearing. Under the circumstances of the case at the time, the court's order was not an abuse of discretion. At the time of the detention hearing, the children already had been detained "with exigency" due to the allegations of physical abuse, son's bruises, and the children's obvious fear of returning to mother. At the hearing, counsel for

the children noted mother still had the children's school computers and they were unsure whether she would return them. The children were concerned because their school—which was virtual at the time due to the pandemic—was scheduled to resume in a matter of days. The children used and needed the computers to access school. Although mother argues she always had ensured the children did well in school and, in fact, they did do well in school, this does not diminish the need for such protection. "Just as in other areas of dependency law, the juvenile court need not wait until harm occurs before making orders to protect the minors." (*In re D.C.* (2015) 243 Cal.App.4th 41, 58, superseded by statute on other grounds as stated in *In re A.M.* (2020) 47 Cal.App.5th 303, 322.)

In addition, the court was open to revisiting the issue of mother's educational rights at the next hearing date, stating, "I am removing that right from the mother at this time even if it is just for the next 90 days until we come back." However, by the next hearing date, which was the jurisdictional and disposition hearing, the case was before a different judge and no one raised the issue for the court's consideration. Of course, if mother believes circumstances have changed sufficiently, she may petition the juvenile court to reconsider its order.

Under the circumstances at the time the order was made, including the exigent nature of the proceedings, we conclude the juvenile court did not abuse its discretion in limiting mother's educational rights.

**DISPOSITION**

The findings and orders are affirmed.

NOT TO BE PUBLISHED.

LUI, P. J.

We concur:

CHAVEZ, J.

HOFFSTADT, J.