Filed 3/12/26  In re K.G. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re K.G. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E086339 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J301947 & J301948) |
| v. | OPINION |
| A.G., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed in part; reversed in part.

Patricia K. Saucier, under appointment by the Court of Appeal, for Defendant and Appellant.

Laura Feingold, County Counsel, David R. Guardado, Deputy County Counsel for Plaintiff and Respondent.

1

Defendant and appellant A.G. (Mother) appeals from the jurisdictional orders adjudicating K.G. (female, born July 2015) and A.R. (male, born February 2009; collectively, Minors) dependents of the court pursuant to Welfare and Institutions Code section 300, subdivisions (b), (e) and (j)[1] and the juvenile court's dispositional order removing Minors from Mother's custody. Minors have a four-month-old half-sibling R.L. (born April 2024), who was severely abused while in the custody of Mother and R.L.'s alleged father.[2] At a jurisdiction and disposition hearing, the juvenile court found true against Mother for Minors allegations pursuant to section 300, subdivisions (b), failure to protect; (e), severe physical abuse of R.L.; and (j), abuse of sibling. Minors were detained from Mother, and she was granted reunification services.

On appeal, Mother contends insufficient evidence was presented to support the juvenile court's jurisdictional findings of the section 300, subdivisions (b), (e), and (j) allegations against her for Minors. She also argues that the section 300, subdivision (e), allegation was improperly included as a jurisdictional finding for Minors, and she received ineffective assistance of counsel (IAC) for her counsel's failure to demurrer to the allegation. Mother also claims that the dispositional order removing Minors from her care must be reversed and that Minors should be placed in her custody under family maintenance services. We reverse in part and affirm in part.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] R.L. is not a subject of this appeal.

## FACTUAL AND PROCEDURAL HISTORY

### A.    SECTION 300 PETITIONS

The family here involves three different fathers:  Edward M. father of K.G.; Joe L., father of R.L.; and Ivan R., father of A.R.

On August 27, 2024, plaintiff and respondent San Bernardino County Children and Family Services (CFS) received an immediate response referral alleging physical abuse to the child R.L. by an unknown perpetrator.  On August 26, 2024, R.L. was brought to Loma Linda University Children's Hospital (LLUCH) suffering from projectile vomiting.  R.L. was admitted to LLUCH for brain bleeding that was causing seizures; he had several healing fractures, including fractures on his ribs, both hands and on his right ankle.  R.L. was given a CT scan and was suffering from a bilateral subdural hemorrhage.

The doctor that treated R.L reported to CFS that the injuries to R.L. were consistent with physical abuse and him being shaken.  Mother reported she did not know how R.L. received his injuries.  The injuries to R.L. were being investigated by the police.  Joe was interviewed and asked about the injuries to R.L.  Joe stated he may have picked up R.L. by his arms and legs.  Joe and Mother tried to blame A.R., stating that A.R. had anger issues.  Mother later denied that A.R. would hurt R.L.  It was determined by CFS that a detention warrant was necessary for Minors and R.L.  R.L. and Minors were detained on August 28, 2024.

Mother had full custody of Minors.  She had full custody of K.G. based on prior domestic violence with Edward.  She had full custody of A.R., but Ivan did visit with the

3

child.  Joe was subjected to a polygraph related to R.L.'s injuries but it could not be completed as he minimized the situation stating he "may" have injured R.L. when he picked him up by his arms and legs.  Joe also stated he accidently hit R.L.'s head on a door.  He further stated he used a massage technique on R.L.'s ribs for gas relief which he " 'may have done it too hard.' "

A.R. was interviewed.  He lived with Mother, Joe, R.L. and K.G.  He felt safe in the home and had not witnessed any domestic violence between Mother and Joe.  Joe was stricter than Mother.  He denied that Joe had an anger problem; he was just strict.

On August 30, 2024, CFS filed a section 300 petition for K.G. and Mother.  The alleged father was Edward.  It was alleged under failure to protect against Mother under section 300, subdivision (b), that on August 24, 2024, R.L. was found to have multiple injuries including rib, right ankle and hand fractures, fibula fractures in both legs, a right tibia corner fracture and had a brain bleed.  The injuries were consistent with non-accidental trauma.  It was alleged that this placed K.G. at risk of suffering similar harm (b-1).  It was alleged against Edward that he had a history of domestic violence with Mother in the presence of K.G. placing her at risk (b-2).  It was also alleged that Mother had a history of domestic violence placing K.G. at risk of abuse (b-3).  It was alleged against Edward, pursuant to section 300, subdivision (g), that it was unknown if he was able to provide provisions of support to K.G. which put her at risk of abuse or neglect (g-4).  It was alleged pursuant to section 300, subdivision (j), abuse of sibling, that K.G.'s half-sibling, R.L., had suffered injuries while in Mother's care and she was unable to

4

provide an explanation for the child's injuries, placing the child at risk for similar harm (j-5).

CFS also filed a section 300 petition for A.R. and Mother on August 30, 2024. The alleged father was Ivan. It was alleged under failure to protect against Mother under section 300, subdivision (b), that on August 24, 2024, R.L. was found to have multiple injuries including rib, right ankle and hand fractures, fibula fractures in both legs, a right tibia corner fracture and had a brain bleed. The injuries were consistent with non-accidental trauma. It was alleged that this placed A.R. at risk of suffering similar harm (b-1). It was alleged against Ivan, pursuant to section 300, subdivision (g), that it was unknown if he was able to provide provisions of support to A.R., which put him at risk of abuse or neglect (g-2). It was alleged pursuant to section 300, subdivision (j-3), abuse of sibling, against Mother, that A.R.'s half-sibling, R.L., had suffered injuries while in Mother's care and she was unable to provide an explanation for the child's injuries placing child at risk for similar harm. There was a similar allegation that K.G.'s half-sibling, R.L. had suffered injuries and that she faced the same risk of harm (j-4).

The detention hearing was held on September 3, 2024. R.L. was still in the hospital. The trial court found a prima facie showing had been made that Minors came within section 300, subdivision (b). Minors were detained from Mother and their respective fathers.

B.     JURISDICTION/DISPOSITION REPORT

CFS filed its jurisdiction and disposition report on September 19, 2024. It sought a continuance in order to assess Edward and Ivan for placement of Minors. CFS was

5

considering that the case could be dismissed with placement of Minors with their respective fathers and dismissal with family law orders. Minors had been placed in a nonrelated extended family member's home.

Mother was interviewed on September 13, 2024. Mother insisted that she took R.L. to the hospital on July 28 and July 29, 2024, to be assessed for a bump on his head. Each time she was told that R.L. was fine and that she needed to monitor the bump. R.L. was again assessed on August 22, 2024, and all of his results were normal. On August 24, 2024, she took R.L. to LLUCH as he was vomiting after each feeding. The prior day, Mother reported that R.L. had appeared "lifeless" as he was not smiling or laughing. R.L. was diagnosed with a urinary tract infection and this was thought to be the cause of his vomiting. R.L. was admitted in order to be administered antibiotics. While in the hospital, R.L. began twitching on the left foot and the left side of his face. It was determined that R.L. was having seizures and had a brain bleed. The fractures to his ribs, arms and legs were found at this time during CT scans. Mother denied she or Joe abused R.L. and she had no explanation for his injuries. Joe had only told Mother that he had accidentally bumped R.L.'s head on door. He also said he may have "rough played" with R.L. and caused the injuries. Mother insisted that any injuries to R.L. were accidental; she had never witnessed Joe abuse R.L. or Minors. Mother did not believe that Joe would hurt Minors, but she had asked Joe to leave the family home.

Mother acknowledged domestic violence between her and Edward, but she was the victim and not the aggressor. She immediately separated from Edward when the domestic violence occurred and she sought family law orders for K.G.

6

Joe was interviewed again and insisted he had no idea how R.L. obtained his injuries. He denied grabbing R.L. hard or physically disciplining him. He did engage in "rough play" with R.L. but not hard enough to cause injury. He "accidently" hit R.L.'s head on a door. He also said that R.L. may have obtained his injuries during diaper changes as R.L. often fought back by kicking not wanting to have his diaper changed. He denied that Mother or Minors caused the injuries to R.L. Joe claimed to have had moved out of the family home.

The doctor who treated R.L. at LLUCH was interviewed. He indicated that R.L.'s injuries were new and old healing fractures. He was unable to determine the age of the injuries, but they were all consistent with "non-accidental blunt force trauma of physical abuse." The injuries were the result of multiple incidents of physical abuse. The medical report for R.L.'s injuries was provided with the jurisdiction and disposition report.

Maternal grandmother was concerned about Minors and R.L. being in the care of Joe. She reported he was stubborn, not patient and had caused problems between her and Mother. A.R. was interviewed and immediately stated that "Joe messed up." He then explained that Mother told him Joe admitted that R.L. was accidentally injured while in his care. A.R. expressed no concerns about being in Joe's care; he had not witnessed Joe be aggressive with R.L. and he had not been abused by Joe.

K.G. also stated Mother told her that Joe admitted to accidentally hurting R.L. K.G. had never witnessed Joe be aggressive with R.L. K.G. was uncertain whether Joe caused the injuries to R.L. on purpose. She enjoyed the time she spent with Joe.

CFS needed more time to interview Ivan and Edward to determine whether they could provide support and provisions for Minors. The possibility of reunification of Minors with Mother was "guarded." Mother was unable to provide an explanation as to how R.L. had been injured. She minimized the concerns of CFS by expressing that she did not believe Joe could have caused the injuries to R.L, and even if he caused the injuries, it was not intentional. Mother did not appear to understand the severity of the risk to Minors if they were left in the care of Joe.

CFS was most concerned about the physical abuse inflicted on R.L. Minors remained in out-of-home care and were doing well. They both expressed wanting to visit with Mother, which was to occur on September 20, 2024. The matter was continued.

An amended petition was filed for K.G, Mother and Edward on October 23, 2024. The b-1, b-2, b-3, g-5 and j-6 allegations remained the same. An additional allegation under section 300, subdivision (e), was alleged against Mother (e-4), severe physical abuse against a child under five years old, in that she forcefully grabbed R.L.'s arms, legs and ribs. R.L. was treated for the blunt force trauma, which was suffered while in Mother's care. An amended petition was filed for A.R., Mother and Ivan. The b-1, g-3, j-3 (renumbered j-4) and j-4 (renumbered j-5) allegations remained the same. An additional allegation under section 300, subdivision (e), was alleged against Mother (e-2), severe physical abuse against a child under five years old, in that she forcefully grabbed R.L.'s arms, legs and ribs. R.L. was treated for the blunt force trauma, which was suffered while in Mother's care.

An addendum report was filed on October 24, 2024. CFS recommended that the allegations in the two petitions be found true except for the g-2 and g-4 allegations against Ivan and Edward. Minors were to remain in out-of-home care and family reunification services should be granted to Edward and Ivan. CFS recommended that no reunification services be offered to Mother and Joe. Edward and Ivan were interviewed and reported the ability to care for Minors. Their homes would need to be assessed for placement.

A detective from the San Bernardino County Sheriff's Department sought to have Mother submit to a polygraph examination but she refused. Mother's prognosis for reunification was poor as she continued to provide no explanation for the injuries inflicted on R.L.; she minimized CFS's concerns. Mother had not demonstrated sufficient protective capacity for Minors and R.L. Further, Mother had not been cooperative with CFS; CFS believed that Mother was aware of how the physical abuse was inflicted on R.L. but had not been forthcoming about the abuse. The matter was continued.

Additional information was provided to the court on December 9, 2024. Mother, Ivan, Edward and Joe were all engaged in services. Minors were in a new placement as of November 6, 2024. Maternal grandmother was being assessed for placement of Minors. The matter was once again continued.

CFS submitted additional information to the court on January 31, 2025. Minors had been placed with maternal grandmother on December 18, 2024. Since placement with maternal grandmother, Mother had violated court orders by having unauthorized

visits with Minors. Mother had driven with maternal grandmother to visits. Mother had gone to the Minors' school without notifying CFS. Maternal grandmother was repeatedly talking to Minors about the dependency case causing them emotional distress. Mother had completed a domestic violence program. She was participating in a parenting class and individual therapy, but CFS reported that the programs would have to be repeated as Mother had failed to benefit from the classes. Mother continued to be in denial about R.L.'s medical needs and "doubts the child's medical state." Mother did not understand CFS's concerns about protecting her children in the future.

CFS also reported that during visits between Mother, Minors and R.L., there was tension between Minors and Mother as she focused her attention on R.L. Ivan's home was found unsuitable for placement of A.R. The jurisdiction and disposition hearing was continued again. At the hearing, the juvenile court warned Mother not to have unauthorized visits with Minors and maternal grandmother was admonished not to discuss the case with Minors.

Another addendum report was filed on February 3, 2025. Mother had completed her parenting classes and individual therapy. CFS was recommending that she reenroll in therapy as she had not demonstrated that she benefitted from the therapy. Mother continued to minimize the concerns of CFS related to R.L.'s medical issues. Further, Mother had stated in 2024 that Joe had moved out of the family home, but it was discovered he remained until January 2025. On March 17, 2025, the jurisdiction and disposition hearing was again continued.

A report was submitted by CFS on March 17, 2025. Mother had completed parenting classes and there was no recommendation for further classes. Ivan was benefitting from services. Edward was doing well in services but needed more time due to medical reasons. Visits were going well with all parents and Minors. Mother had been following court orders. CFS continued to be concerned about Mother's denial of R.L.'s medical state and her denial that he needed any special health care. She disagreed that R.L. should be considered as a client for the Inland Reginal Center (IRC). Minors had started participating in therapy. Prior to the jurisdiction and disposition hearing, counsel for Mother submitted a psychological evaluation of Mother that was performed by Dr. Marina Bassili.[3]

C.      JURISDICTION/DISPOSITION HEARING

The contested jurisdiction and disposition hearing commenced on April 23, 2025. CFS moved into evidence all of its reports.

Dr. Bassili testified. Prior to meeting with Mother, Dr. Bassili reviewed all of the reports in the case. Dr. Bassili met with Mother for three hours on November 12, 2024. Dr. Bassili administered three different psychological tests on Mother. Mother was tested as to her overall cognitive ability. She scored in the average range. Dr. Bassili did not detect any cognitive deficits that would impede her ability to benefit from services. She was also tested as to any learning deficit or learning disability. She had average learning

_____

[3] We do not set forth the facts in the report as Dr. Bassili testified at the jurisdiction and disposition hearing about the report and her testimony will be set forth in detail, *post*.

ability and no significant learning impairment. She was also given a comprehensive psychological assessment. There was concern that she may be underreporting. She did appear to present herself in a favorable, almost unrealistic, light. Dr. Bassili explained this was somewhat common in these types of cases. Her scores were elevated on an SFI test, which was a consideration of self-importance. This could mean that Mother did not want to admit her shortcomings or that she had a sense of self-importance or superiority. Dr. Bassili did not think that this score was impeding Mother's progress in therapy; Mother's therapist reported that Mother was open and engaged in therapy.

After Dr. Bassili's first interview with Mother, she felt Mother lacked the insight as to the severity of the abuse to R.L. that occurred, and she lacked insight into as to why allegations were being brought against her. Dr. Bassili did not believe that services to Mother would be helpful at that time since she had not acknowledged the abuse. Dr. Bassili opined "You can't treat something that hasn't been acknowledged."

Dr. Bassili met again with Mother on March 11, 2025. Mother had completed some of her services—therapy, parenting and domestic violence classes—by the time of the second meeting. Mother demonstrated an acknowledgment of CFS's concerns. Mother was more open and exhibited less depressive and anxious symptoms. Mother also acknowledged the severity of the injuries to R.L. and his possible long-term medical needs. It was Dr. Bassili's opinion that Mother would benefit from participation in services. There was no impairment that would hinder her from continuing to benefit from services.

Mother had told Dr. Bassili that regardless of whether she believed that Joe did or did not inflict the injuries on R.L., she should have been more concerned that he had not previously told her about R.L. hitting his head on a door. Mother also wanted to give Minors more responsibilities so their voices could be heard and they could have independence. Dr. Bassili believed that services should mitigate the risk of abuse. Dr. Bassili believed that Mother would benefit from continued therapy and that her treatment should continue to be monitored by the juvenile court. Mother had provided no other explanation as to how R.L. obtained his injuries to Dr. Bassili. Dr. Bassili clarified that Mother had initially not acknowledged that R.L. was hurt; she had progressed in that she now admitted the R.L. had been injured and would have long-term medical needs. However, she had not provided an explanation as to how R.L. was injured. Mother intended to take proactive measures by keeping a safe home and not being in contact with Joe. Mother had never taken accountability for the abuse to R.L.

Dr. Bassili did have some concern about the veracity of Mother's answers based on the finding of self-importance. Dr. Bassili indicated that she could not be certain that the changes she observed in Mother at the second meeting could be sustained over time. Further, she considered that Mother was motivated to get her children back. She was still concerned about the lack of protective action in preventing the abuse in the first place. The only protective action Mother identified was no contact with Joe. Dr. Bassili would recommend services to Mother even if she was the perpetrator of the abuse as she had already shown a benefit from engaging in therapy and parenting classes. She

13

recommended further therapy and parenting classes to address the risk factors of further abuse to Minors or R.L.

Mother also testified. She denied that she physically abused R.L. She had sought treatment for R.L. for the bump on his head and was initially advised there were no concerns. She left R.L. in the care of Joe when she had to take Minors to school or run errands. When she initially heard of the injuries R.L. had suffered, she was in shock and was unsure how he sustained the injuries. She was "shocked" to find out that Joe had hit R.L.'s head on the door. By the time she was interviewed for the jurisdiction and disposition report, she believed that Joe was responsible for the injuries. She had completed therapy, parenting classes and domestic violence classes and stated what she had learned from each program. She admitted that she contacted Minors in violation of the court's order but had stopped. She acknowledged that R.L. would need long-term care due to the injuries he sustained. She insisted she stopped living with Joe in August 2024. She never told a social worker Joe moved out in January 2025. She did not intend to get back together with Joe. The matter was continued to May 7, 2025.

Mother continued her testimony on May 7, 2025. She had completed more therapy sessions, which gave her more insight into how to be a protective mother and understand R.L.'s injuries. She did not know if Joe intentionally caused R.L.'s injuries but she did believe he caused them based on the medical reports. She had no contact with Joe since December 2024 and would have no further contact. She once again denied she physically abused R.L.

14

Maria Orozco, a social worker for CFS, had been assigned to the instant case in August 2024 to determine the proper jurisdiction and disposition orders for the case. The recommendation for Mother was no reunification services for Minors and R.L. Mother had still not demonstrated a protective capacity for Minors and R.L. Mother told another social worker that she was still with Joe until January 2025. Minors also advised CFS that Mother was with Joe until January 2025. Mother had admitted that it was possible that Joe caused the injuries to R.L. but still insisted that it was not intentional.

A.R. testified that he understood from maternal grandmother that Joe had still been living with Mother until January 2025. A.R. did not know how R.L. sustained his injuries.

At the end of evidence, CFS argued that it was not clear who perpetrated the abuse of R.L. but he was in the care of Mother and Joe at the time of the injuries. Mother had wavered as to whether the injuries were accidental despite the medical reports finding that the injuries were the result of nonaccidental blunt force trauma and physical abuse. Mother came to the conclusion that Joe was the one who injured R.L. in September 2024 but remained with him until at least December 2024. She had not benefitted from therapy by continuing to consider that Joe unintentionally caused R.L.'s injuries. CFS doubted her protective capacity. The case involved severe physical abuse that could have resulted in death or disfigurement. CFS recommended striking the g-3 and g-5 allegations against Ivan and Edward. The juvenile court struck the allegations and the j-5 allegation for A.R. finding it inapplicable. Edward's counsel requested dismissing the b-2 domestic violence allegation. The juvenile court agreed and dismissed the allegation.

15

Mother's counsel argued the b-3 allegation against her for domestic violence related to K.G.'s petition should be dismissed. The juvenile court found the allegation not true. Mother's counsel further argued that reunification services should be granted to Mother because there was no proof that she knew or should have known that Joe was abusing R.L., as required to bypass services. Further, Dr. Bassili testified Mother was benefitting from services. Minors were extremely bonded to Mother and wanted to reunify with Mother. Minors' counsel agreed with granting services to Mother. Minors wanted to be placed together. CFS responded that Mother was the primary caregiver for R.L. and there was sufficient evidence to support that she should have known about the abuse.

The juvenile court found the b-1, e-4 and j-6 allegations in the K.G. petition to be true. The b-1, e-2 and j-4 allegations were found true for A.R. The allegations for R.L. were all found true. Minors were removed from the home and Mother was granted reunification services for Minors; the juvenile court found that it was in Minors' best interests to have Mother receive services. The juvenile court found that they were bonded to Mother and there was no evidence they were also physically abused. The juvenile court indicated when discussing the findings for R.L, that it found Mother was not a credible witness. She did not appear to be forthcoming, and it seemed that she coached A.R. on his testimony. The juvenile court was also concerned that Mother had violated court orders. The juvenile court believed the social worker, that Mother admitted to being with Joe until January 2025. The juvenile court believed that Mother was dishonest in order to get what she wanted.

16

Mother filed an appeal from the juvenile court's jurisdiction and disposition orders for Minors.

**DISCUSSION**

A.     JURISDICTION

Mother contends that no substantial evidence supported the section 300, subdivision (b), (e), and (j), allegations in the petitions for Minors.[4] CFS concedes there was not sufficient evidence of the section 300, subdivision (e), allegations for Minors. However, the remaining jurisdictional findings support the petitions.

"Dependency adjudication 'allows the juvenile court, within specified limits, to assert supervision over the endangered child's care' [citation], and is therefore a weighty determination with important consequences. Yet it is also true that a jurisdictional finding is 'a first step, and the system includes many subsequent safeguards to ensure that parental rights and authority will be restricted only to the extent necessary for the child's safety and welfare.' " (*In re N.R.* (2023) 15 Cal.5th 520, 556.) " 'While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the child to the defined risk of harm. Thus, previous acts of neglect, standing alone, do not establish a substantial risk of harm; there must be some reason beyond mere speculation to believe they will reoccur.' " (*In re R.L.* (2025) 115 Cal.App.5th 221, 230-231.)

---

[4] Mother presents argument that the claims are not moot and that the jurisdictional findings are reviewable based on her liberty interest in Minors. Jurisdictional and dispositional orders are routinely reviewed on appeal, and such arguments are unnecessary and will not be addressed.

"Jurisdiction under section 300, subdivision (b), requires proof of (1) the specified parental condition or conduct (2) that has caused (3) 'serious physical harm or illness' or a 'substantial risk' of such harm or illness." (*In re L.W.* (2025) 109 Cal.App.5th 1012, 1019; see also *In re Cole L.* (2021) 70 Cal.App.5th 591, 601.) "Generally, to acquire jurisdiction under subdivision (b) of section 300, the juvenile court was obliged to find that the child 'has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result' of specified forms of parental neglect, including substance abuse, domestic violence, and failure to protect the child." (*In re L.O.* (2021) 67 Cal.App.5th 227, 237.)

An allegation under section 300, subdivision (j), provides, "The child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions. The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child."

" 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' " (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).) " 'Subdivision (j) thus allows the court to take into consideration factors that might not be determinative if the court were adjudicating a petition filed directly under one of those subdivisions. [¶] The broad language of subdivision (j) clearly indicates that the trial court is to consider the totality of the circumstances of the

18

child and his or her sibling in determining whether the child is at substantial risk of harm, within the meaning of *any* of the subdivisions enumerated in subdivision (j). The provision thus accords the trial court greater latitude to exercise jurisdiction as to a child whose sibling has been found to have been abused than the court would have in the absence of that circumstance.' " (*Id.* at p. 774.)

Section 300, subdivision (e), provides for jurisdiction if, "The child is under five years of age and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child."

The burden of proof at the jurisdictional hearing is a preponderance of the evidence. (*In re I.C.* (2018) 4 Cal.5th 869, 876; *In re B.H.* (2024) 103 Cal.App.5th 469, 479-480.) "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

" ' "We review the juvenile court's jurisdictional findings for sufficiency of the evidence. [Citations.] We review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's

19

orders, if possible. [Citation.] 'However, substantial evidence is not synonymous with any evidence. [Citations.] A decision supported by a mere scintilla of evidence need not be affirmed on appeal. [Citation.] Furthermore, "[w]hile substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; *inferences that are the result of mere speculation or conjecture cannot support a finding* [citations]." [Citation.] "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record." ' " ' " (*In re J.A.* (2020) 47 Cal.App.5th 1036, 1046; see also *I.J.*, *supra*, 56 Cal.4th at p. 773.)

### 1.    *SECTION 300, SUBDIVISION (E)*

CFS concedes on appeal that the section 300, subdivision (e), allegation was not supported by the evidence, and the concession is appropriate. The allegation had no application to the petitions alleged against Mother for Minors. It alleged that R.L. was abused but such allegation did not provide jurisdiction over Minors. Further, it was not alleged, and there was no proof, that Minors themselves had been physically abused and it could not be alleged that they were less than five years old. The section 300, subdivision (e), allegation for abuse of R.L. was not appropriately included in the petitions related to Minors. As such, the section 300, subdivision (e), allegations for Minors should be stricken.

### 2.    *SECTION 300, SUBDIVISIONS (J) AND (B)*

The remainder of the allegations in the petitions are supported by the evidence. The section 300, subdivision (j), allegations were supported by substantial evidence for

Minors. "In general, the more egregious the abuse experienced by the sibling, 'the more appropriate for the juvenile court to assume jurisdiction over the siblings' under section 300(j)." (*In re S.R.* (2024) 104 Cal.App.5th 44, 53.) "[S]ection 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction. The subdivisions at issue here require only a 'substantial risk' that the child will be abused or neglected." (*I.J.*, *supra*, 56 Cal.4th at p. 773.) " 'Some risks may be substantial even if they carry a low degree of probability because the magnitude of the harm is potentially great.' . . . In other words, the more severe the type of sibling abuse, the lower the required probability of the child's experiencing such abuse to conclude the child is at a substantial risk of abuse or neglect under section 300. If the sibling abuse is relatively minor, the court might reasonably find insubstantial a risk the child will be similarly abused; but as the abuse becomes more serious, it becomes more necessary to protect the child from even a relatively low probability of that abuse." (*Id*. at p. 778.)

Here, the abuse of R.L. was severe. He had multiple fractures on his limbs, he was first admitted to the hospital because he was vomiting and could not keep any food down, and he was found to have a brain bleed. The treating physician determined the injuries could have only been caused by intentional blunt force trauma. It was never disclosed by Mother or Joe how the injuries occurred. Joe made statements that he accidentally hit R.L.'s head on a door, that he played roughly with him, that he may have been injured during diaper changes and that he may have picked up R.L. by the arms and legs. Joe insisted all of the injuries were not intentional, but this contradicted the medical reports and a doctor's determination that they were the result of intentional blunt force

21

trauma injuries. There simply was no explanation for the injuries to R.L. This put Minors at risk as the injuries could have resulted from a fit of rage by Joe or even could have been caused or contributed to by Mother, and there was a risk that such harm could be inflicted on Minors.

Further, the doctor noted that the injuries were in varying states of healing, which was indicative of the abuse occurring over a period of time and not just based on a single incident. The juvenile court reasonably could conclude Minors were at risk of similar harm based on not knowing how these injuries were inflicted. The risk of similar harm to Minors was prevalent and the lack of acknowledgment of how the physical abuse occurred put Minors at substantial risk of similar harm in the future. This supported the true finding on the section 300, subdivision (j), allegation.

Mother insists that she testified at the jurisdiction/disposition hearing that Joe caused R.L.'s injuries "which, definitively provided an explanation for R.L.'s injuries." While Mother testified that Joe was the cause of the injuries, she never provided an explanation of how these injuries were inflicted on R.L. Further, the juvenile court expressly stated that it did not find Mother to be credible and was only stating what she thought the court wanted to hear. The juvenile court could reasonably conclude that there was no evidence of how these injuries occurred, and that Minors remained at risk of similar harm despite Mother's statements.

Mother relies on *In re S.R.*, *supra*, 104 Cal.App.5th 44, to support her claim that Minors were not at substantial risk of suffering from similar harm as R.L. In *S.R.*, the child was sexually abused by the mother's fiancée. (*Id.* at p. 50.) The juvenile court

22

found that one of the child's siblings, a male sibling who was 15 years old, was at risk of similar harm—sexual abuse—the child. This court reversed such finding, concluding there was no evidence the teenage male sibling would suffer sexual abuse at the hands of the mother's fiancée as there was no evidence that the fiancée had a propensity to sexually abuse teenage boys and the sibling had lived with the fiancée for eight years without any sexual abuse occurring. No other allegations of similar harm, such as physical abuse, were brought in the petitions, requiring reversal of the jurisdictional findings. (*Id.* at pp. 51, 54-55.)

This case is not similar as it does not involve sexual abuse, but rather severe physical abuse. The similar harm to Minors was that they were at risk of similar physical abuse. Here, it is unknown how R.L. received his injuries so it was reasonable for the juvenile court to consider that Minors may suffer similar physical abuse, unlike in *In re S.R.* in which the evidence showed that the fiancée had sexually abused the child and this was the single allegation: that the male, 15-year-old sibling would suffer the same harm.

This case is more akin to *I.J.*, *supra*, 56 Cal.4th 766. In *I.J.*, the father sexually abused and raped his 14-year-old daughter. There were four younger siblings, including three sons, and it was alleged in a petition that father's sexual abuse of the daughter placed all the children at risk of harm. The petition contained allegations of not only the similar harm of sexual abuse, but also other allegations including risk of physical harm. (*Id.* at p. 771.) There was no evidence that the sons were sexually abused or sustained physical abuse. The juvenile court found jurisdiction pursuant to section 300, subdivision (j), as to the sons. (*I.J.*, at p. 772.) The Supreme Court upheld the ruling. It found, "The

23

serious and prolonged nature of father's sexual abuse of his daughter under these circumstances supports the juvenile court's finding that the risk of abuse was substantial as to all the children." (*Id.* at p. 778.)

Here, R.L.'s injuries had been inflicted over some period of time. The injuries were severe and the petitions alleged that Minors were at risk of similar harm. The juvenile court did not find Mother credible, placing Minors at risk if she allowed Joe to return to the home, or if Mother in fact had some culpability in the abuse of R.L., supporting the section 300, subdivision (j), finding.

Mother contends the true finding on the section 300, subdivision (e), allegation "tainted" the section 300, subdivision (j), finding by the juvenile court. Mother states, "Here, jurisdiction under section 300, subdivision (j), was premised on the abuse of A.R. and K.G.'s half-sibling, R.L. . . . Yet, given the nature and severity of R.L.'s injuries, once the court sustained the section 300, subdivision (e), allegations as to A.R. and K.G. by clear and convincing evidence, it effectively predetermined the juvenile court sustaining the subdivision (j) allegations." The record supports that the juvenile court reviewed all of the evidence in support of its finding on the section 300, subdivision (j), allegation and made an independent finding as to abuse of Minors' sibling. There is no evidence that the true finding on the section 300, subdivision (e), allegation tainted the findings on the section 300, subdivision (j), allegation. The juvenile court was aware that the allegations all stemmed from the abuse of R.L. and there is no argument by Mother that such injuries did not occur. The record contains sufficient evidence to support the jurisdictional finding under section 300, subdivision (j), and such evidence was not

24

tainted by the improper inclusion of the section 300, subdivision (e), allegations in the petitions.

The section 300, subdivision (b), allegation was based on the failure of Mother to protect based on R.L. being found to have multiple injuries including rib, right ankle and hand fractures, fibula fractures in both legs, a right tibia corner fracture and a brain bleed on August 24, 2024. The injuries were consistent with non-accidental trauma and Minors were at risk of suffering similar harm. The section 300, subdivision (b), allegations were supported by the same evidence as the section 300, subdivision (j), allegations and we have found such evidence supported the jurisdictional finding by the juvenile court.

B.      INEFFECTIVE ASSISTANCE OF COUNSEL

Mother contends she received ineffective assistance of counsel due to her counsel's failure to demurrer to the section 300, subdivision (e), allegations in the petitions for Minors. She insists the allegation permeated the entire proceedings and she would have received a more favorable result absent the allegation.

"A parent in a dependency proceeding is entitled to competent counsel and to judicial review of claims of ineffective assistance of counsel. [Citations.] A parent seeking to establish ineffective assistance of counsel must show both that counsel failed to act in a manner to be expected of a reasonably competent attorney practicing in the field of juvenile dependency law, and that it is ' "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' [Citation.] When a parent seeks to assert ineffective assistance of counsel on direct appeal (as opposed to by writ of habeas corpus), appellate courts further limit their

25

review to consider only those claims ' "where 'there simply could be no satisfactory explanation' for trial counsel's action or inaction." ' " (*In re M.F.* (2022) 74 Cal.App.5th 86, 108-109.)

"A court need not evaluate whether counsel's performance was deficient before examining prejudice suffered by defendant. [Citation.] Thus, a court may reject a claim if the party fails to demonstrate that but for trial counsel's failings, the result would have been more favorable to the defendant." (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1180.)

Here, Mother cannot show prejudice based on counsel's failure to object to the section 300, subdivision (e), allegation for Minors. As shown above, the petitions were supported by both the section 300, subdivisions (j) and (b), allegations, and we have found that the true finding of the allegations by the juvenile court did not taint the other findings. Mother would not have received a more favorable result if counsel had objected to the section 300, subdivision (e), allegation and it had been stricken.[5]

C.      DISPOSITION

Mother contends there was insufficient evidence to support the dispositional order removing Minors from her custody.

_____

[5] In the reply brief for the first time Mother contends prejudice based on her inclusion in the California Child Abuse Central Index. We reject this argument made for the first time in the reply brief. " ' "We will not ordinarily consider issues raised for the first time in a reply brief." ' " (*In re R.Q.* (2023) 96 Cal.App.5th 462, 470.) Further, we are ordering that the section 300, subdivision (e), allegation be stricken.

"[I]f the court exercises jurisdiction over the minor, it must decide the appropriate disposition. Generally, the court chooses between allowing the child to remain in the home with protective services in place and removing the child from the home while the parent engages in services to facilitate reunification." (*In re E.E.* (2020) 49 Cal.App.5th 195, 205.) "California law . . . 'requires that there be no lesser alternative before a child may be removed from the home of his or her parent.' [Citation.] But, ' " '[t]he parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' [Citation.] The court may consider a parent' s past conduct as well as present circumstances." ' " (*In re L.O.*, *supra*, 67 Cal.App.5th at pp. 244-245.)

We recognize that "past abuse of a sibling does not, on its own, justify removing a child from their parents." (*In re E.E.*, *supra*, 49 Cal.App.5th at p. 216.) Conceivably, Minors, who were older than R.L. could "articulate any abuse to which [they] may be subjected." (*Ibid.*) However, the juvenile court believed that Mother had coached A.R. as to how to testify at the jurisdiction and disposition hearing. This was concerning in that A.R. may not report if he was subjected to abuse, or if K.G. was abused, which made returning Minors to the care of Mother, even under family maintenance, a concern as to whether they would be safe in her care.

Moreover, there was other evidence before the juvenile court, which warranted removal of Minors from Mother's care. Mother initially did not acknowledge the severity of R.L.'s injuries and the need for long-term medical care. It was only just prior to the jurisdiction and disposition hearing that Mother stated she now understood the

severity of R.L.'s injuries but continued to believe that they were accidentally caused by Joe. She also stayed with Joe even after he disclosed hitting R.L.'s head on the door. While Mother eventually had Joe move out of the house, this reflected on her capacity to protect Minors. Further, Mother had violated court orders by seeing Minors at times other than at supervised visits and had to be admonished by the juvenile court. This evidence was relevant to whether a less restrictive means would be effective in protecting Minors such as family maintenance. The juvenile court could reasonably be concerned that she would not follow orders if awarded custody with family maintenance or other restrictive orders. (See *In re John M.* (2012) 212 Cal.App.4th 1117, 1127 [the mother twice violated court orders showing that the juvenile court could not safely place the minor in her custody as she may not follow court orders].) Finally, Dr. Bassili herself recommended that Mother engage in further therapy and parenting classes and the doctor was concerned that Mother still had not acknowledged how R.L.'s injuries were inflicted. Dr. Bassili expressed concern that Mother still did not have the protective capacity to care for Minors. There was clear and convincing evidence before the juvenile court to support the dispositional order removing Minors from Mother's care and granting her reunification services.

Mother contends that Minors were removed from her care without "even a hint of evidence demonstrating danger in Mother's care." She also claims that the finding on the section 300, subdivision (e), allegation resulted in an automatic removal from the home under section 361, subdivision (c)(1). She insists the juvenile court did not make concrete findings that reasonable efforts were made to prevent the removal of Minors

from her care or that there was clear and convincing evidence of harm if Minors were not removed from her care.

The juvenile court reviewed all of the reports submitted by CFS. CFS never stated that Minors should be removed automatically under section 361, subdivision (c)(1).[6] Rather, the last disposition report stated that the court should remove Minors from Mother's care due to "clear and convincing evidence" that there was substantial risk to Minors if they were to remain in Mother's custody. CFS noted that reasonable efforts were made to prevent removal. The juvenile court adopted the recommendations of CFS. There simply is no evidence in the record that the juvenile court order related to disposition was based on the presumption in section 361, subdivision (c)(1).[7] Further, the juvenile court awarded reunification services to Mother, despite a finding of section 300, subdivision (e), which would allow a bypass of services. (See § 361.5, subd. (b)(6)(A).) While the juvenile court did not express its findings on the record regarding disposition, substantial evidence supports the implied findings by the juvenile court that removal of

---

[6] Section 361, subdivision (c)(1), provides in pertinent part, "The fact that a minor has been adjudicated a dependent child of the court pursuant to subdivision (e) of Section 300 shall constitute prima facie evidence that the minor cannot be safely left in the physical custody of the parent, guardian, or . . . custodian with whom the minor resided at the time of injury."

[7] We note that Mother in her ineffective assistance of counsel claim raises that she was prejudiced by the finding of the section 300, subdivision (e), allegation based on the juvenile court having no other choice but to remove Minors from Mother's care. As noted, the juvenile court reviewed the evidence and there is no indication in the record that it relied on the section 300, subdivision (e), allegation in reaching its decision on disposition.

29

Minors from Mother's care was necessary. (*In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1166.)

Further, the juvenile court heard the testimony from Dr. Bassili, a social worker, and Mother. The juvenile court found Mother to not be credible. It remained concerned that Mother could not protect Minors. The record supports the disposition finding by the juvenile court.

## DISPOSITION

The jurisdictional finding under section 300, subdivision (e), for Minors is reversed and should be stricken by the juvenile court. The remaining jurisdictional and dispositional orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER

J.

We concur:

RAMIREZ

P. J.

CODRINGTON

J.